In re DIAMOND REO TRUCKS, INC., d/b/a Diamond Reo Trucks, Inc. and Diamond Reo Properties, Inc., Debtor.

Lloyd H. KEMPF, Trustee, Plaintiff,

v.

The CITY OF LANSING, E.I.C., Inc., J.W. Hayes, J.S. Mark, S. Stein, W.H. Leach, Southern Salvage Services, Inc., and Reo Properties, Inc., Defendants.

Bankruptcy No. 74–1778–B–5.
Adv. No. 88–0398.

United States Bankruptcy Court,
W.D. Michigan.

June 20, 1990.

Jeffrey Haynes, Bloomfield Hills, Mich., for E.I.C., Inc., Hayes, Mark, Stein, and Leach.

Eric Linden, Detroit, Mich., for Reo Properties, Inc.

David Murphy, Detroit, Mich., for trustee.

Steven Weyhing, Detroit, Mich., for City of Lansing.

James Wiggin, Cincinnati, Ohio, for Southern Salvage, Inc.

## ORDER

LAURENCE E. HOWARD, Bankruptcy Judge.

This adversary proceeding was filed by the Trustee to collect for environmental recovery costs incurred at the Debtor's business site. The Trustee is seeking summary judgment on his complaint, and several Defendants are seeking summary judgment on their cross-claims. A hearing was held on April 10, 1990, and the motions were taken under advisement. For the reasons stated in this opinion, the Trustee's motion is denied, Reo Properties' motion is granted in part and denied in part, and the City of Lansing's motion is granted in part and denied in part.

## FACTS

In 1904, the Debtor or one of its predecessor companies acquired a parcel of real property located in Lansing, Michigan. From 1904 through 1975, the Debtor operated an automotive manufacturing facility on that property, including a number of underground tanks for fuel storage. On December 28, 1972, the Debtor sold the real estate, but not the buildings or other personal property upon the real estate, to Defendant E.I.C., Inc., who immediately deeded the real estate to Defendants Hayes, Mark, Stein, and Leach. That group immediately leased the real estate back to the Debtor, with no interruptions in the Debtor's operations. On December 6, 1974, the Debtor filed a voluntary petition

under Chapter XI of the Bankruptcy Act,[1] and continued its operations at the site. On April 22, 1975, a receiver was appointed and operations continued. The Debtor was adjudicated a bankrupt as of the close of business on May 31, 1975. Subsequently, a trustee was appointed, and operations continued for a short time to allow the completion of several outstanding manufacturing contracts. On October 15, 1975, an order was entered by this court upon stipulation of the parties. The order rejected the lease under which the Debtor was occupying the premises, but provided that the Debtor could occupy the premises for six months, paying rent of $50,000 month, retroactive to June 1, 1975. The continued occupancy enabled the Trustee to sell the Debtor's personal property.

On April 30, 1976, Defendants Hayes, Mark, Stein, and Leach deeded the real estate back to Defendant E.I.C. On July 30, 1976, E.I.C. sold the site to Defendant Southern Salvage, Inc. On August 3, 1976, Southern Salvage sold an undivided one-half interest in the property to Defendant Reo Properties, Inc., creating a tenancy in common. Subsequently, on May 5, 1978, the State of Michigan acquired an interest in portions of the site due to Southern Salvage and Reo Properties' failure to pay property taxes. That portion was deeded to the City of Lansing on January 12, 1979, and on April 18, 1979, the City of Lansing acquired the remaining interest in the property from Reo Properties and Southern Salvage through a quit-claim deed. The City paid Reo Properties and Southern Salvage a total of $150,000.00 for the transfer.

On August 2, 1988, the City of Lansing filed an administrative priority claim in the amount of $6,736,745.00, for clean up of the site, alleging that the site was polluted. The City based its claim on the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675, otherwise known as "CERCLA". That claim was later amended to $14,662,680.00. On September 15, 1988,

---

1. Initially, it is important to note that this case is governed by the Bankruptcy Act and not the Bankruptcy Code. This is due to Sec. 403(a) of

the Bankruptcy Reform Act of 1978, which provides that all actions commenced prior to October 1, 1979 are to be governed by the prior act.

the Trustee commenced the present adversary proceeding, alleging that if the site is polluted, the estate is entitled to contribution from the Defendants. The City filed a cross-claim against the other Defendants, alleging strict liability under CERCLA. Those Defendants also filed counterclaims against the Trustee for reimbursement of any costs for which they were found liable in regard to clean up of the site.

On February 10, 1989, the court approved the settlement of the City's proof of claim with the Trustee, in the amount of $3,250,000.00, and the both parties dismissed their claims against each other with prejudice. The order specifically stated that no determination was made as to whether the claim constituted a priority administrative expense. The other claims, cross-claims, and counterclaims are still pending.

## INTRODUCTION

The Trustee seeks summary judgment pursuant to Federal Rule 56(c), as incorporated by Bankruptcy Rule 7056. The Trustee asserts that the Defendants' claims for indemnification or contribution are not allowed under the Bankruptcy Act because they are unliquidated and contingent, thus entitling him to judgment as a matter of law. In the alternative, if the court finds those claims allowable, the Trustee seeks partial summary judgment on the issue of whether the claims are entitled to administrative priority.

Reo Properties also seeks summary judgment pursuant to Federal Rule 56(c) and Bankruptcy Rule 7056, against the City of Lansing's cross-claim for contribution. Reo Properties asserts that 1) it was not an owner or operator of the facility at the time the pollution occurred; 2) the corporation has dissolved, thus barring any cause of action against it; and 3) that when it quitclaimed its interest in the property to the City of Lansing, it was released from any claims. Thus, Reo Properties argues that it cannot be held liable for clean up costs.

Finally, the City of Lansing is seeking summary judgment pursuant to Federal Rule 56 and Bankruptcy Rule 7056 on its cross-claims against the Defendants. The City bases its motion on the strict liability provisions of CERCLA.

Under Federal Rule 56, as incorporated by Bankruptcy Rule 7056, summary judgment is appropriate when no genuine issue of material fact exists. When deciding a motion for summary judgment, I must view the evidence in the light most favorable to the nonmoving party. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

## CERCLA

Initially, all three of these motions rest upon the liability provisions of CERCLA. The goal of CERCLA is simple: the clean up of hazardous substances. The question of who is responsible for that clean up has proven to be not so simple. At § 9607(a), CERCLA provides a list of responsible parties. For the purposes of this opinion, the relevant portions are found at § 9607(a)(1) and (2):

(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]

An "owner or operator" is defined at § 9601(20)(A):

(20)(A) The term "owner or operator" means (i) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility, and (iii) in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of State or local government, any person who owned, operated or otherwise controlled activities at such facility immediately beforehand. Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.

A "facility" under CERCLA encompasses much more than the ordinary meaning of the word. The term is defined at § 9601(9):

> (9) The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

I will now address the motions in order.

## TRUSTEE'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

 The Trustee first asserts that the Defendants' counterclaims are not allowable, and alternatively, if they are, that they are not to be accorded administrative priority status. The Trustee argues that the counterclaims are unliquidated or contingent, and not capable of reasonable estimation, and thus pursuant to § 57(d) of the Act, are not allowable. That section states:

> d. Claims which have been duly proved shall be allowed upon receipt by or upon presentation to the court, unless objection to their allowance shall be made by parties in interest or unless their consideration be continued for cause by the court upon its own motion: *Provided, however,* That an unliquidated or contingent claim shall not be allowed unless liquidated or the amount thereof estimated in the manner and within the time directed by the court; and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this Act.

Despite the Trustee's argument to the contrary, § 57(d) is not analogous to § 502(e) of the Code. Section 57(d) permitted the court to use discretion in allowing an unliquidated or contingent claim if the court believed that the claim could be reasonably estimated. Under § 502(e), the court has no such discretion and is not permitted to allow a reasonable estimation even if the estate would not be unduly burdened, on claims for reimbursement or contribution. Thus, the cases that the Trustee cites that were decided under § 502(e) standards are neither controlling nor persuasive.

The Defendants assert that their claims are capable of reasonable estimation. They refer to several estimates of the cost of the clean up procedures that have been previously submitted to this court. In addition, the Defendants assert that the City of Lansing has nearly concluded its investigations, studies, and remedial plans for the clean up of the site.

Thus, the Trustee's motion for summary judgment must fall, because there is a genuine issue of material fact as to whether the claims are capable of reasonable estimation. The Trustee argues that the sums are not fixed at this time, and are not capable of being reasonably estimated. That may be, but the Defendants have provided evidence indicating that reasonable estimation is possible, and may in fact be possible in the near future, given the current status of the City of Lansing's clean up efforts. In light of this factual dispute, summary judgment is not proper, and the Defendants' counterclaims are not dismissed on this basis.

 Alternatively, the Trustee argues for partial summary judgment, asking this court to hold that the Defendants' counterclaims are not entitled to administrative priority status. Both the Trustee and the Defendants agreed in their briefs that § 64 of the Act and § 503 of the Code are analogous provisions, both giving administrative priority to the actual and necessary costs and expenses of preserving the estate. The Trustee argues that clean up expenses will not benefit or preserve the estate. That seems a bit tenuous, given the proposition that the Debtor, as an owner/operator who disposed of hazardous substances, is liable under § 9607(a)(2) of CERCLA. The Defendants argue that the Sixth Cir-

cuit has allowed administrative priority for CERCLA claims. In the case of *In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir.1987), response costs incurred by a state were accorded administrative status. In that decision, the Sixth Circuit quoted language from *In re T.P. Long Chemical Inc.*, 45 B.R. 278, 286 (Bankr.N.D.Ohio 1985) with approval, stating: "Since the estate cannot avoid the liability imposed by CERCLA, it follows that the cost incurred ... in discharging this liability *is an actual, necessary cost of preserving the estate entitled to administrative expense priority.*" *Wall Tube* at 123–24 (emphasis in original). However, in both of those cases, the government had gone in and cleaned up the site, and was seeking reimbursement from the Debtor. In other words, the government had discharged the Debtor's duties, and then sought to be reimbursed. Such was the situation in other cases, most notably *In re Peerless Plating Co.*, 70 B.R. 943 (Bankr.W.D.Mich.1987), where the Environmental Protection Agency had cleaned up the Debtor's site and sought reimbursement as an administrative expense. This differs from the present situation as clean up procedures have yet to be completed, and it appears that parties other than solely the Debtor may be responsible for the cost of those clean up procedures. More persuasive is the case of *In re Sterling Steel Treating, Inc.*, 94 B.R. 924 (Bankr.E.D.Mich.1989). In that case, a third party purchased property from the debtor at a postpetition sale. The third party proceeded to clean up hazardous wastes and withheld a portion of the purchase price equal to the costs incurred. The court concluded that under the contribution provision of CERCLA, found at § 9613(f)(1), and its equitable considerations, the third party must equally bear the clean up cost with the Debtor. *Id.* at 931. Applying this analysis to the present situation, the Defendants' counterclaims against the Trustee are for contribution. In other words, if the City of Lansing recovers monies from the Defendants on its cross-claims, the Defendants want to claim those amounts as administra-

tive expenses. The court will ultimately decide on whether those contribution claims are allowed, and if so, in what amounts. Any allowed amounts would be representative of the amount the Defendants paid on behalf of the Debtor. Any unallowed amounts borne by the Defendants would be representative of their liability. Thus, any allowed contribution amounts are entitled to administrative priority, and the Trustee's motion for partial summary judgment also falls. An order may enter providing that any contribution amounts the court later determines are due from the estate are entitled to administrative priority status.

## REO PROPERTIES' MOTION FOR SUMMARY JUDGMENT

■ Reo Properties argues that it has no liability under CERCLA for the contamination of the Diamond Reo site. Reo Properties acquired an interest in the land in 1976, and held it as a tenant in common with Southern Salvage [2] prior to portions of the property being acquired by the State of Michigan. Due to the tax delinquency that gave rise to the state's partial acquisition, both Reo Properties and Southern Salvage meet the definition of an owner or operator found at § 9601(20)(A)(iii), which states in pertinent part:

(iii) in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment, or similar means to a unit of State or local government, any person who owned, operated or otherwise controlled activities at such facility immediately beforehand.

While meeting this definition, Reo Properties argues that no "disposal," as statutorily defined, occurred during its ownership, thus relieving it of the liability imposed by § 9607(a)(2). Additionally, Reo Properties argues that since its corporation dissolved in 1979, liability cannot be imposed because a corporation cannot be sued for causes of actions that first arose after dissolution. Finally, Reo Properties argues that it can-

---

**2.** Approximately four days after Southern Salvage acquired the property, it deeded an undi-

vided one-half interest in the property to Reo Properties.

not be held liable because the quit-claim deed it executed to the City of Lansing contained a clause which released Reo Properties from any future claims.

Under CERCLA, the term "disposal" is defined by the definition provided in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3):

> (3) The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

It is undisputed that at the time of Reo Properties' ownership, August 3, 1976 through April 18, 1979, the Debtor had ceased its manufacturing operation and was no longer engaged in "active" disposal. The City of Lansing argues two points: 1) that Reo Properties can be held liable for "passive" disposal; and 2) that Reo Properties and Southern Salvage abandoned drums containing paints, paint wastes, and paint solvents on the site when its interests were terminated in 1979.

First, the City argues that liability can be imposed for "passive" disposal. The City bases its argument on the point that the definition not only encompasses active disposal, but broadly envelops other activities, such as "leaking." The City relies on *United States v. Waste Industries, Inc.*, 734 F.2d 159, 164 (4th Cir.1984), where the court stated: " 'Leaking' ordinarily occurs when landfills are not constructed soundly or when drums and tank trucks filled with waste materials corrode, rust, or rot." The Fourth Circuit construed the term "disposal" to include passive occurrences. Contrast this to the decision in *Ecodyne Corporation v. Shah*, 718 F.Supp. 1454, 1457 (N.D.Cal.1989), where the court did not so broadly interpret "disposal." In that decision, the court was faced with the choice of interpreting the term as did the Fourth Circuit, or to limit it. In response to the Fourth Circuit's decision in *Waste Industries*, the court stated: "However broad Congress may have intended the definition,

Congressional intent does not justify the distortion [of] the statute." *Ecodyne* at 1457. Instead, the court looked at the grammar and structure of the definition of disposal, and held that § 9607(a)(2) liability encompassed active conduct:

> Pursuant to § 9607(a), four categories of persons, the first two of which are relevant to this case, can be held liable for costs. The first category is under § 9607(a)(1). This category encompasses the current owner of the property. The second category is under § 9607(a)(2) which primarily covers prior owners and operators and is more limited in scope.... To define disposal as plaintiff wishes would effectively make all property owners from the time a site became polluted (up to and including the current owner) potentially liable under § 9607(a)(2) even if these owners did not introduce the chemicals onto the site. Such a construction conflicts with the limited scope of § 9607(a)(2).

> In sum, in an effort to provide a more temporal interpretation of § 9607(a)(2), this Court reads this provision as only providing an action against prior owners or operators who owned the site at the time the hazardous substances were introduced into the environment.

I agree with that interpretation. Otherwise, the liability imposed by § 9607(a) could have been drafted to simply include all owners or operators in the chain of title subsequent to the contamination. However, while imposing strict liability, Congress limited its imposition to certain persons who meet the specific requirements set forth at § 9607(a). Thus, the mere ownership of the site during a period of time in which migration or leaching may have taken place, without any active disposal activities, does not bring Reo Properties within the liability provision of § 9607(a)(2). While it would be financially desirable and perhaps ethically correct to hold all owners of record liable, I agree with the Seventh Circuit:

> To the point that courts could achieve "more" of the legislative objectives by adding to the lists of those responsible, it

is enough to respond that statutes have not only ends but also limits. Born of compromise, laws such as CERCLA and SARA do not pursue their ends to their logical limits.... A court's job is to find and enforce stopping points no less than to implement other legislative choices. *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157 (7th Cir. 1988). This court cannot be a legislative body; that function properly lies with Congress. As Judge Zatkoff recently stated in *The Anspec Co., Inc. v. Johnson Controls, Inc.*, to be reported at 734 F.Supp. 793 (E.D.Mich.1989):

> While changes to the categories of potentially liable parties may be necessary, Congress must be the body to make such changes. Only Congress has the resources to adequately investigate and determine whether or not liability under CERCLA should be imposed on additional parties. Until such time, the courts should not deviate from the four existing categories of potentially liable parties which Congress clearly mandated under CERCLA.

Thus, there is no genuine issue of material fact, and Reo Properties is entitled to summary judgment as a matter of law as to their liability on the "passive" disposal issue.[3]

■ Second, the City asserts, by way of a letter from the state Department of Natural Resources and an engineer's affidavit, that approximately 150 drums containing hazardous substances were abandoned on the site by Reo Properties and Southern Salvage. There are no allegations that the drums were leaking, but rather, that the drums were abandoned on the site and had to be disposed of by the City. This issue was raised immediately prior to the hearing, and the Defendants disputed it. The letter does not specifically state what was contained in the drums but ruled out PCB. The affidavit states that hazardous substances were in the drums, but does not state what type nor how they were verified

by testing. For those reasons, as well as the fact that the Defendants had no meaningful opportunity to respond, a genuine issue of material fact remains and summary judgment is inappropriate on this issue. As Reo Properties is an "owner" as defined by CERCLA, if it later turns out that they did abandon the drums on the site, and that the drums contained hazardous wastes, I will consider at that time whether they may rely on the dissolution of the corporation or the quit-claim deed as a defense to liability for the costs incurred by the City in disposing of the drums.

## THE CITY OF LANSING'S MOTION FOR SUMMARY JUDGMENT

The City of Lansing seeks summary judgment against all other Defendants on its cross-claims for contribution. This motion is for a determination of liability alone, not to determine dollar amounts of liability.

CERCLA, specifically § 9613(f)(1), allows a party to seek contribution from any person who is liable or potentially liable under the provisions of § 9607(a). As to Reo Properties, my ruling on its motion for summary judgment is dispositive of the City's motion as it applies to Reo Properties. Since Southern Salvage held the property as a tenant in common with Reo Properties, the reasoning behind my decision on Reo Properties can be extended to Southern Salvage. The City of Lansing cannot recover for passive disposal, but a genuine issue of material fact exists as to the alleged abandonment of barrels containing hazardous substances by Reo Properties and Southern Salvage.

■ On the other hand, Hayes, Mark, Stein and Leach are all subject to liability by virtue of § 9607(a)(2), because they owned the facility during times of disposal. They argue that the issue of whether disposal occurred after 1972 is still in dispute. I find this position unsupported. The Debtor continued its manufacturing operations after the sale of the real estate, and an affidavit of an engineer confirmed that dis-

---

**3.** Additionally, the third party defense to liability found at § 9607(b)(3) would be rendered impotent if subsequent owners were held liable

for "passive" disposal, because the defense is only applicable if a party acquires the site *after* disposal.

posal took place throughout the Debtor's tenure at the site. The Defendants have offered no substantive evidence in return to rebut this proposition.

■ While the Defendants argue that they never "operated" the facility, their ownership of the real estate during the Debtor's operations suffices for § 9607(a)(2) liability. Once liability is established under § 9607(a), exculpation is available in limited areas. There was some debate during oral argument about whether the Defendants could avail themselves of the "innocent purchaser" or "innocent landowner" defenses found at § 9607(b)(3). That subsection states:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> \* \* \* \* \* \*
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions[.]

By the terms of § 9607(b)(3), the third party's act or omission cannot be in connection with a contractual relationship. That phrase is defined at § 9601(35), and some exceptions are also provided:

> (35)(A) The term "contractual relationship", for the purpose of section 9607(b)(3) of this title includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:
>
> (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.
>
> (ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.
>
> (iii) The defendant acquired the facility by inheritance or bequest.
>
> In addition to establishing the foregoing, the defendant must establish that he has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title.

Defendants Hayes, Mark, Stein and Leach cannot avail themselves of this defense. In *United States v. Northernaire Plating Co.*, 670 F.Supp. 742, 748 (W.D.Mich.1987), *aff'd*, 889 F.2d 1497 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990), Judge Hillman simplified the statutory language and stated the three elements necessary to use § 9607(b)(3):

> (1) that a third party was the sole cause of the release or threatened release of a hazardous substance; (2) that the act or omission of the third party causing the release did not occur in the context of a contractual relationship existing directly or indirectly with the defendant; and (3) that the defendant took due care and precautions to prevent the foreseeable acts or omissions of the third party causing the release or threatened release.

Judge Hillman applied § 9607(b)(3) in a situation similar to the present one: the government had sued both the landowner-lessor and the operating lessee for clean up costs. Noting the lease between the defendants, Judge Hillman held: "This contractual relationship precludes either of these defendants from invoking the protections of Section 9607(b)(3)...." *Id.* Judge Hillman based his decision on the second prong of the § 9607(b)(3) test. Applying that reasoning in the present case, Defendants Hayes, Mark, Stein and Leach cannot use § 9607(b)(3), and are liable. A contractual relationship, the lease, existed, and none of the caveats found at § 9601(35)(A) existed; most importantly, the Defendants did not acquire the property "after the disposal or placement of the hazardous substance...." The Debtor's operations continued after the Defendants' acquisition of the property. Thus the city's motion as to those parties is granted.

■ E.I.C. presents an interesting issue. It acquired the land and transferred it on the same day, December 28, 1972, and was not a party to the leasing arrangement with the Debtor. However, it again acquired the site for a period of three months, from April 30, 1976 to July 30, 1976. The issues of E.I.C.'s ownership and liability arise from both possessions. It is necessary to separate the two possessions, as there may come a time when this court is asked to allocate the costs of clean up among the liable parties other than on pro-rata basis.

While E.I.C. did become the owner of the site on December 28, 1972, it immediately transferred its interest to Hayes, Mark, Stein, and Leach. In effect, E.I.C. was a "straw," or conduit, through which ownership of the site passed from the Debtor to the four individuals. It would be tenuous to hold such a constructive owner liable. I decline to find that E.I.C. was an owner for purposes of § 9607(a)(2), as such a holding would be extending the statutory language to an absurd plateau, thereby perverting congressional intent.

As to E.I.C.'s second possession, the rationale behind my decision on the passive disposal issue is applicable. The Debtor was not operating when E.I.C. acquired the property on April 30, 1976, and there has been no evidence that E.I.C. engaged in any disposal of its own. Therefore, E.I.C. also incurred no liability during its second possession.

## CONCLUSION

The Trustee's motion for summary judgment or partial summary judgment is denied. Any contribution amounts that the court determines to be due from the estate are entitled to administrative priority status.

Reo Properties' motion for summary judgment is granted as to its liability for the Debtor's disposal. The motion is denied to the extent that a genuine issue of material fact exists on whether Reo Properties abandoned barrels containing hazardous substances on the site.

The City of Lansing's motion for summary judgment is granted as to the liability of Hayes, Mark, Stein, and Leach. The City's motion is denied as to Reo Properties, Southern Salvage, and E.I.C., as none are liable for the Debtor's disposal. As stated previously, a genuine issue of material fact exists as to whether Reo Properties and Southern Salvage abandoned barrels containing hazardous substances on the site.

At the hearing on these motions, the court indicated that a pretrial conference would be scheduled as soon as possible following this decision. As such, I have set the pretrial conference for Wednesday, July 11, 1990, at 9:00 a.m. in Grand Rapids.