Garsh, J.
The plaintiffs Edward J. Byrnes, Wilfred Sherman and Sharon Tomasello, as trustees of 144 Addison Street Condominium Trust (the “Condominium Trust”), brings this action against the defendant, Massachusetts Port Authority (“Massport”), for damages arising out of the purchase of property at 144 Addison Street, East Boston, Massachusetts (the “Property”), in 1985. The Condominium Trust asserts claims for violations of G.L.c. 21E, breach of contract, breach of the covenant of good faith and fair dealing, and deceptive practices in violation of G.L.c. 93A.
Massport has now moved for summary judgment with respect to all claims other than those brought under c. 2 IE for oil remediation expenses incurred within three years of the commencement of this action. For the reasons set forth below, the Court grants, in part, Massport’s motion for partial summary judgment.
Background
The Condominium Trust seeks to recover property damages and clean-up costs arising from environmental contamination on the Property. The contamination allegedly was caused both by oil from an underground storage tank (the “Fuel Tank”) and by an underground buried storage drum and tank trailer containing trichlorom ethane (“TCE”).
On February 10, 1970, Massport purchased the Property from Transition Electronic Corporation. Approximately three years later, on April 12, 1973, Massport entered into a nine-year lease (the “1973 *4 Lease”) for the first floor of a building on the Property with Leonard Silver Manufacturing Co., Inc. (“Leonard Silver”). The 1973 Lease was signed under seal. Leonard Silver used the Properly for office space, shipping, packaging, and storage. Under the terms of §6.5 of the 1973 Lease, Massport was responsible for repairs to the exterior of the building. Section 6.8 of the 1973 Lease obligated Massport to “maintain the heating plant” in order to provide “reasonable heat at reasonable times.” Leonard Silver was required to pay for a percentage of “minor expenses” incurred in maintaining the heating plant. Costs incurred in connection with other than “minor repairs and/or renovation” were the responsibility of Massport. The Property’s heating system was fueled by No. 6 oil held in the Fuel Tank.
In 1975 the Property’s heating system developed problems. Periodically it would shut off and the boiler stack would emit smoke. The problems were caused by water entering the Fuel Tank. Massport devised a method of pumping the water out and sealing the cracks in the Fuel Tank; however, the problems persisted and the Department of Environmental Protection (“DEP”) cited Massport for violations of air pollution. The violations included black smoke coming from the boiler stack. After responding to the violations, an engineer at Massport recommended that Massport add certain monitoring devices and provide maintenance of the boiler. The changes were characterized as “minimum necessary items to keep [the] plant operating ... and to satisfy the State Health Air Quality Control Office.” Charles Hill, one of Leonard Silver’s employees at the time, purports to have knowledge of some activity by Massport. Exactly when he acquired this knowledge is not clear.[1] Charles Hill now is a condominium owner at the Property and a member of the Condominium Trust.
In March 1977, Massport and Leonard Silver agreed to terminate the 1973 Lease and to enter into a new lease for a term of fifteen years (the “1977 Lease”). Under the 1977 Lease, Massport leased the entire Property to Leonard Silver, including all buildings. The 1977 Lease effectively was an installment agreement permitting Leonard Silver to purchase the Property from Massport.[2] Shortly after executing the 1977 Lease, Leonard Silver arranged for the Fuel Tank to be decommissioned. The Fuel Tank subsequently was drained, caved in, filled, and blacktopped.
Approximately eight years later, on September 25, 1985, Leonard Silver notified Massport that it intended to exercise its option, under the 1977 Lease, to purchase the Property. Leonard Silver employed Bewick Associates (“Bewick”) to perform an environmental analysis of the Properly. Bewick’s report (the “1985 Environmental Report”), issued on June 17, 1985, concluded that there was no evidence of an oil or hazardous material release on the Property.
Five days later, Leonard Silver granted to Edward J. McCormack, Jr. (“McCormack”) an option to purchase the Property, effective when Leonard Silver acquired it from Massport. Their agreement was memorialized in a Sale-Leaseback Agreement among Leonard Silver, its affiliate Towle Manufacturing Co. (‘Towle”), and Addison Realty Trust, a nominee trust created by McC-ormack. In the Sale-Leaseback Agreement, Leonard Silver agreed to assign to Addison Realty Trust its rights under the 1973 Lease and the 1977 Lease.[3]
On October 4, 1985, Massport received the balance of rent due under the 1977 Lease. Massport, in turn, delivered to Leonard Silver a quit claim deed conveying the Property to Leonard Silver’s designated nominee, Addison Realty Trust. Six months later, on March 24, 1986, Towle and Leonard Silver filed for bankruptcy protection, which led to termination of the lease between Towle and Addison Trust.
On March 9, 1988, Addison Realty Trust, intent on converting the Property into condominiums, engaged Bewick to do another environmental audit. Bewick’s preliminary findings, issued on March 17, 1988, were that there existed approximately 20,000 to 40,000 gallons of residual oil in the decommissioned underground Fuel Tank, and that the surrounding soil was contaminated. On March 22, 1988, Addison Realty Trust notified the Department of Environmental Quality Engineering (now the DEP) of Bewick’s findings.
In its final environmental audit report, issued on March 31, 1988, Bewick, for the first time, reported high levels of TCE at two locations on the Property. Specifically, the final report disclosed that TCE had been found in two containers buried underground, a drum and tank trailer. The final report also indicated that Transition Electronic Corporation had stored TCE at the Property during its ownership.
On July 15, 1988, McCormack, as Trustee of Addison Realty Trust, created a condominium on the Property pursuant to G.L.c. 183A. Some units were retained by McCormack as Trustee of Addison Realty Trust. The remaining units were purchased by Wilfred Sherman and Roger N. Sherman, as Trustees of 144 Realty Trust, and by Charles Hill (collectively “Unit Owners”). The Unit Owners created 144 Addison Street Condominium Trust, the plaintiff in this action, and empowered it to enter into contracts for the remediation of the oil and TCE contamination. Addison Realty Trust assigned its rights under the 1973 Lease and 1977 Lease to the Condominium Trust.
On September 20, 1988, the Condominium Trust contracted for cleanup of the Property. The Condominium Trust made payments on November 1, 1988, November 16, 1988, December 12, 1988, April 19, 1989, and April 20, 1989, totaling $812,135.25
On March 19, 1992, the Condominium Trust commenced this action against Massport. When the suit was filed, the DEP had not yet issued a release letter to the Condominium Trust certifying that the remedial action which had been undertaken was adequate and that DEP would require no further cleanup measures.
*5 DISCUSSION
Summary judgment shall be granted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). With respect to any claim on which the party moving for summary judgment does not have the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson v. Time, Inc., 404 Mass. at 17.
COUNT I. G.L.c. 2 IE: Statute of Limitations — Release of Oil
To the extent that the Condominium Trust seeks reimbursement, pursuant to the Massachusetts Oil and Hazardous Material Release Prevention Act, G.L.c. 21E, §4, for payments made prior to March 1989 to assess or clean up the Property, Massport contends that these claims are barred by the statute of limitations. The statute of limitations does not begin to run until the property owner’s liability is “finally fixed.” Hays v. Mobil Oil Corp., 736 F.Supp. 387, 396-97 (D.Mass. 1990), aff'd in part and remanded in part on other grounds, 930 F.2d 96 (1st Cir. 1991). See also Olivera v. Pereira, 414 Mass. 66, 74 (1992) (citing with approval Hays v. Mobil Oil Corp., supra).
It cannot be said that the Condominium Trust’s liability with respect to its one-phase response action was finally fixed more than three years prior to the commencement of this action. As the Supreme Judicial Court has noted, “(i]t may take several years of sophisticated environmental studies before the plaintiff can determine whether he has a claim or has a claim serious enough to warrant suit.” Id. at 74 n. 12. Thus, with respect to the Condominium Trust’s claim for oil remediation damage, Massport’s motion for summary judgment is DENIED.
Massport also asserts that the Condominium Trust’s claim for property damage, brought pursuant to G.L.c. 21E, §5, is time barred. The Condominium Trust knew of the environmental problems on the Property by virtue of Bewick’s second environmental report dated March 17, 1988, more than three years prior to commencement of this action. In response to Massport’s motion for partial summary judgment, the Condominium Trust conceded that its §5 claim should be dismissed. Accordingly, Massport’s motion for summary judgment is ALLOWED with respect to the §5 claim asserted in Count I.
COUNT II. G.L.c. 21E: TCE Releases
Massport contends that the wording of G.L.c. 21E, §5(a)(2) bars the Condominium Trust’s claim for relief relating to TCE contamination because there is no evidence that TCE was “stored or disposed of’ at the Property while it was owned by Massport. The Condominium Trust does not argue that TCE was “stored” on the Property when it was owned by Massport, but it contends that TCE was then “disposed of’ because it “leaked” or “leached” from a burled drum and tanker trailer.[4]
To be liable under G.L.c. 21E, one must fit within one of the five categories of liable persons. Section 5(a)(2)[5] of G.L.c. 21E imposes liability on:
any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material.
“Disposal” is not a defined term. The Condominium Trust maintains that “disposal” includes “leaking” or “leaching” because both those words are a part of the definition of “release,” which is a defined term. The word “release” is defined, in pertinent part, as:
any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment.
G.L.c. 21E, §2 (emphasis supplied). Massport, on the other hand, argues that “disposal” means something more than mere leaking or leaching, both of which are passive occurrences. The plain meaning of the statute supports Massport’s position.
The language of the statute is the starting point, the “principal source of insight into the legislative intent.” Acme Laundry Co. v. Secretary of Environmental Affairs, 410 Mass. 760, 770 (1991). In addition to ordinary usage, words must be considered “in connection with the cause of [the statute’s] enactment, the mischief or imperfection to be remedied and the main object to be accomplished . . .” Board of Education v. Assessor of Worcester, 368 Mass. 511, 513 (1975).
In the absence of any statutory definition of “disposal,” the first step is to look at the words chosen by the General Court, employing their “plain and ordinary meaning.” Commonwealth v. One 1987 Mercury Cougar Automobile, 413 Mass. 534, 537 (1992). The plain and ordinary meaning of “disposal” is the affirmative act of getting rid of something over which one has control. It does not have a passive meaning that would encompass liquid leaking or leaching from a container which was buried before the site had been acquired.
*6 “We derive the words’ usual and accepted meanings from sources presumably known to the statute’s en-actors, such as their use in other legal contexts and dictionary definitions.” Commonwealth v. Zone Books, Inc., 372 Mass. 366, 369 (1977). The dictionary defines “disposal” as “the act or process of disposing.” “Disposed of,” in turn, is defined as “to get rid of.” Webster’s New Collegiate Dictionary at 365 (9th ed. 1986).[6] Reference to a legal dictionary produces the same result. The word “disposal” is defined as the:
[sjale, pledge, giving away, use, consumption or any other disposition of a thing. To exercise control over; to direct or assign for use; to pass over into the control of some one else; to alienate, bestow, or part with.
Black’s Law Dictionary at 471 (6th ed. 1990). The phrase “dispose of’ is defined as:
To alienate or direct the ownership of property, as disposition by will. Used also of the determination of suits. To exercise finally, in any manner, one’s power of control over; to pass into the control of someone else; to alienate, relinquish, part with, or get rid of; to put out of the way; to finish with; to bargain away. Often used in restricted sense of “sale” only, or so restricted by content.
Id. (emphasis supplied). Griffith v. New England Telephone & Telegraph Co., 414 Mass. 824, 828 (1993) (using Black’s to assist in interpreting term “abandoned” in G.L.c. 2 IE). These definitions connote an affirmative act. Someone — not necessarily the owner — must do something. The plain and ordinary meaning is conclusive as to legislative intent in the absence of any contrary evidence, none of which is present here. Commonwealth v. One 1987 Mercury Cougar Automobile, 413 Mass. at 537.
The ordinary meaning of “disposal” is consistent with the context in which it is used. Attorney General v. School Committee, 387 Mass. 326, 337 (1982). In order for a prior owner to be liable, an owner must have owned a site “at the time of storage or disposal,” hazardous material must have been “stored or disposed of’ from that site, “and" there must have been a “release or threat of release” from such site. G.L.c. 21E, §5(a)(2) (emphasis supplied). A release or threat of a release alone is not enough.
If the Legislature had intended “disposal” to include all the words listed in the definition of “release,” both passive words such as “leaking” and “leaching” and active words such as “dumping” or “emptying,” it would have been unnecessary to add limiting phrases which restrict a prior owner’s liability to ownership at the time of “storage or disposal.” The singling out of the words “storage” and “disposal” and the omission of other words in the definition of “release” from the qualifying phrases in §5(a)(2) is strongly indicative that those other words were intended to be excluded. Generally, a statutory expression of one thing is an implied exclusion of the other things omitted from the statute. Harborview Residents’ Committee Inc. v. Quincy Housing Authority, 368 Mass. 425, 432 (1975). The statute easily could have been written to provide that a prior owner is liable if it owned the site during a release or threat of release. There would have been no reason to connect “disposed of’ in §5(a)(2) with the prepositional phrase referring to “release” by the word “and." Under the construction advanced by the Condominium Trust, there is no difference between the terms “disposal” and “release." Statutory language should not be regarded as superfluous. Hodge v. King, 33 Mass.App.Ct. 746, 754 (1992). The statute should be construed to give effect to every provision. School Committee v. Teachers’ Retirement Board, 393 Mass. 256, 262 (1984).
Context is not limited to the subsection in which the word at issue is used. The interpretation of a term also must be faithful to the construction of the statute as a whole. Commonwealth v. One 1987 Mercury Cougar Automobile, 413 Mass. at 538. “[A] statute should be read as a whole to produce an internal consistency.” Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 316 (1991). There are five separate categories of liable persons. Section 5(a)(1) covers present owners. It makes responsible the owner of a site “from or at which there is or has been a release or threat of release of oil or hazardous material.” In contrast to §5(a)(2), no qualifying phrases are included. The Condominium Trust’s reading of §5(a)(2) “violates the rule that where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present.” Beeler v. Downey, 387 Mass. 609, 616 (1982). If the Legislature had intended “disposal” to encompass passive leaking or leaching, there would have been no need to have one categoiy of liable persons for present owners and another for prior owners. The Legislature simply could have provided that, once a release occurs, the owner and all owners thereafter in the chain of title are liable. Ecodyne Corp. v. Shah, 718 F.Supp. 1454, 1457 (N.D. Cal. 1989). It did not do so, but instead put current and prior owners into distinct categories, and employed veiy different language for §5(a)(1) than for §5(a)(2).
The context, therefore, supports the proposition that “disposal” was intended to have a meaning narrower than “release.” “Release” includes “disposal,” but “disposal” does not include “release.” United States v. Petersen Sand & Gravel Inc., 806 F.Supp. 1346, 1351 (N.D. Ill. 1992) (“release” more inclusive than “disposal”). See also New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir. 1985) (in construing analogous provisions of CERCLA, the Second Circuit observed that “Congress intended to cover different classes of persons differently . . . section 9607(a) (2)’s scope is more limited than that of section 9607(a)(1). Prior owners and operators are liable only if they owned and operated the facility ‘at the time of disposal of any hazardous substance’; this limitation does not apply to current owners . . .”).
The Condominium Trust urges the Court to adopt the definition of “disposal” in the Federal Comprehen *7 sive Environmental Response, Compensation, and Liability Act (“CERCLA”), “the federal analogue” ofc. 21E.[7] Sheehy v. Lipton Industries, Inc., 24 Mass.App.Ct. 188, 198 (1987). See also Griffith, 414 Mass. at 827-28 (CERCLA considered in construing meaning of “owner or operator”). In 42 U.S.C. §9601(29), CERCLA defines “disposal” by incorporating, by reference, the definition of disposal in the Solid Waste Disposal Act (“SWDA”), 42 U.S.C. §6903(3), which provides:
[T]he term “disposal” means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.
The fact that CERCLA defines “disposal,” by reference, to include “leaking” is not persuasive that a court, interpreting c. 2 IE, should do the same. Because CERCLA was a model for c. 21E, the Legislature’s failure to borrow that definition is a sign that it did not intend to track the federal statute on this issue. Acme Laundry v. Secretary of Environmental Affairs, 410 Mass. at 771 (quoting Globe Newspaper Co. v. Boston Retirement Board, 388 Mass. 427, 432-33 (1983)) (when the language of c. 2 IE differs in material respects from CERCLA, which the Legislature considered, “a decision to reject the legal standards embodied or implicit in the language of the federal statute may be inferred”).
Not only does c. 21E fail to define “disposal” in the manner chosen by Congress, but there are differences in the wording of the comparable provisions. CERCLA creates liability for any person who owned a site “at the time of disposal” of a hazardous substance. 42 U.S.C. §9607(a)(2). Unlike §5(a)(2), storage is not mentioned. The concept of storage is subsumed under the federal definition of “disposal,” which includes “deposit” and the “placing of’ hazardous waste into or on any land. Chapter 2 IE, by contrast, focuses on ownership at the time of “storage or disposal.” If “disposal” in c. 21E were synonymous with “disposal” as defined in the federal SWDA, then the reference to “storage” in §5(a)(2) would be superfluous, a result this court should attempt to avoid. Adamowicz v. Ipswich, 395 Mass. 757, 760 (1985) (statute not to be interpreted so as to make any portion meaningless).
Even with CERCLA explicitly incorporating SWDA’s expansive definition of disposal, several courts nevertheless have found that prior owners are not liable under CERCLA for mere passive leaking or leaching occurring during ownership of the site. E.g., Joslyn Manufacturing Co. v. T.L. James & Company Inc., 836 F.Supp. 1264, 1270 (W.D. La. 1993) (liability of prior site owners may not be predicated “solely on the basis that rainfall obviously causes hazardous material to leach through the soil”); United States v. Petersen Sand & Gravel Inc., 806 F.Supp. at 1350-52 (former owner not liable for mere ownership during period of “passive release” because leaking or leaching does not constitute “disposal”); Snediker Developers Limited Partnership v. Evans, 773 F.Supp. 984 (E.D. Mich. 1991) (mere ownership of property after previous owner used site for dumping does not make subsequent owner liable for leaking of hazardous materials from dump site); Ecodyne Corp. v. Shah, 718 F.Supp. at 1457 (former owner liable only if owned the site at the time hazardous substances were introduced); In re Diamond Reo Trucks, Inc., 115 B. R. 559, 565-66 (Bkrtcy. W.D. Mich. 1990) (“mere ownership of the site during a period of time in which migration or leaching may have taken place, without any active disposal activities,” not sufficient to trigger prior owner’s “disposal” liability). Cf. Commonwealth v. Blackstone Valley Electric Co., 777 F.Supp. 1036, 1040 (D.Mass 1991) (discovery of hazardous material and smearing of some on bulldozer track is insufficient to establish “disposal of hazardous waste” under CERCLA provision holding liable any person who arranged for disposal of hazardous substances).[8]
There is no reason to assume that the Legislature intended “disposal” to signify something other than its ordinary meaning. The primary purpose of G.L.c. 21E was to improve the Commonwealth’s capability to respond to environmental contamination and to “recover response costs from persons responsible for the contamination.” Guaranty-First Trust Co. v. Textron, Inc., 416 Mass. 332, 335 (1993). Another purpose was to permit private individuals to recover for losses resulting from contamination. Id, The Condominium Trust argues that defining “disposal” as less inclusive than “release” would vitiate the polity of strict liability. Such an interpretation, it argues, would graft a “fault system” onto §5(a)(2). ‘These worries are overstated . . . requiring that ‘disposal’ be active before imposing liability has nothing to do with requiring fault.” United States v. Petersen Sand & Gravel Inc., 806 F.Supp. at 1352. The trigger to liability remains ownership (or operation) of a facility at the time of disposal, not culpability or responsibility for the contamination. Put simply, notions of fault, such as negligence, knowledge, or foreseeability, do not come into play because ownership at the time of “disposal” is a concept quite distinct from causation. New York v. Shore Realty Corp., 759 F.2d at 1044. Compare G.L.c. 21E, §5(a)(5) (liability for any person who “caused” release or threat of release).
The Condominium Trust argues next that if “disposal” does not include “leaking” and “leaching,” the provisions of G.L.c. 21E, §5(c)(3), the so-called “innocent landowner” provision,[9] will be rendered surplus-age. Just the opposite is true. The predicate act of disposal may be committed by anyone, even a trespasser, over whose activities the property owner may have had no control or knowledge. A neighbor, for example, may dump toxic substances on an owner’s land, openly or covertly. Sheehy v. Lipton Industries, Inc., 24 Mass.App.Ct. 188, 191 n. 2, 197 (1987). That owner then would be liable under §5(a)(2). Without the *8 “innocent landowner” provision, a prior owner would remain liable for any unauthorized acts occurring when it owned the site.
Nor does Massport’s construction render §5(a)(5) superfluous. As discussed above, a prior owner is liable under §5(a)(2) even if it did not “cause” the disposal if someone else stored or disposed of hazardous material during its ownership of the site. Section 5(a)(5) makes that someone else liable as well.
The Condominium Trust’s argument that “disposal” must be construed to include “leaking” and “leaching” so as not to give owners, aware of underground leaking, an incentive to sell their property without disclosing the contamination is not persuasive. When §5(a)(2) was enacted, the Legislature chose to impose civil and criminal liability, including imprisonment, for an owner’s failure to notify immediately the DEP of any release or threat of release of hazardous material. G.L.c. 21E §§7, 11. It was the Legislature that decided to delete this requirement in 1992, St. 1992, c. 133, §§302, 599. As originally drafted, the notification requirements would have served to prevent a current owner from becoming a prior owner. It cannot be assumed that c. 21E, §5(a)(2) was drafted with that purpose in mind. Moreover, c. 21E, §5(a)(l) creates a strong incentive for any potential purchaser to investigate the possibility of contamination before purchasing land. Chapter 93A, as well as the common law, are further deterrents to the transfer of property which the seller knows needs remediation. “These constraints should operate effectively to close any loophole that [the Legislature] may have left open by only imposing liability on those who were owners . . . at the time of an active event constituting disposal of a hazardous substance.” United States v. Petersen Sand & Gravel, Inc., 806 F.Supp. at 1353.
This Court should not adopt a construction of “disposal” that would be in blatant disregard of its plain and ordinary meaning simply because the Legislature might have widened even further the categories of parties deemed responsible for the contamination. The classifications it chose presumably were the result of political compromise. In construing a statute, it is important not only to pay close attention to what it says, but also to “listen attentively to what it does not say.” Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 536 (1947).
To the point that courts could achieve “more” of the legislative objectives by adding to the lists of those responsible, it is enough to respond that statutes have not only ends but also limits. Born of compromise, laws such as CERCLA and [21E] do not pursue their ends to their logical limits... A court’s job is to find and enforce stopping points no less than to implement other legislative choices.
In re Diamond Reo Trucks Inc., 115 B.R. at 565-66 (quoting Edward Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 157 (7th Cir. 1988)). See also Ecodyne, 718 F.Supp. at 1457.
In sum, to trigger liability under c. 21E, §5(a)(2), there must be some activity, albeit not necessarily activity initiated or directed or undertaken or known by the prior owner, pursuant to which hazardous waste is introduced on or into the property when the prior owner owned the site. The Condominium Trust has failed to make a showing that such activity took place when Massport owned the Property. Accordingly, with respect to the Condominium Trust’s claim for TCE contamination, the motion for summary judgment is ALLOWED.[10]
COUNT III. Breach of Contract
Massport argues that the breach of contract claims in Count III based on the 1977 Lease are barred, as a matter of law, because all covenants in the 1977 Lease were extinguished when Addison Realty Trust accepted the quit claim deed for the Property from Massport in 1985. The general rule is that acceptance of a deed extinguishes all obligations of the seller to the buyer relating to the properly to be transferred except those specifically written in the deed. Pybus v. Grasso, 317 Mass. 716, 717 (1945). The quit claim deed provided by Massport did not state that obligations under the 1977 Lease were to survive. The provision in the 1977 Lease giving the tenant the option to purchase and agreeing to convey “good and marketable title to the Leased Premises subject to rights, obligations, restrictions of record” does not, as the Condominium Trust maintains, remove this transaction from the operation of the merger doctrine.
Nor would a lessor’s obligations under a lease to maintain property be one so “collateral to the main promise to convey the land” that survivability would not be “inconsistent with the deed.” Id. at 719. There are not separable undertakings here. Compare Lipson v. Southgate Park Corp., 345 Mass. 621 (1963). If Massport had a continuing affirmative obligation to clean up the oil contamination, surely it would go “to the very essence of what [was] to be conveyed and [would] almost certainly [have been] the subject of provisions in the deed.” Snyder v. Sperry & Hutchinson Co., 368 Mass. 433, 442 (1975).
The Condominium Trust has not identified any provision of the 1977 Lease that was violated during the pendency of that lease. The Condominium Trust does not argue that Massport failed to convey good, marketable title to the Property. Nor could it. The mere possibility that, as of the date the conveyance, the Commonwealth, in the future, might incur assessment costs and might attach a lien under G.L.c. 21E, §13, as a result of contamination on the Property, is insufficient to create a defect in title. Chicago Title Insurance Co. v. Kumar, 24 Mass.App.Ct. 53, 56 (1987). “The presence of hazardous material may affect the market value of the [plaintiffs] land, but, on the present record, it does not affect the title to the *9 land.” Id. at 57. Therefore, Massport’s motion for summary judgment with respect to an alleged breach of the 1977 Lease is ALLOWED.
Massport contends it is entitled to judgment with respect to the 1973 Lease as well because its obligations under that lease were automatically extinguished upon commencement of the 1977 Lease. Certainly, when a lease ends, the obligations under that lease also terminate. Nevertheless, if a breach occurs during the term of a lease, relief remains available, unless expressly agreed otherwise. Morad v. Ramos, 330 Mass. 560, 563 (1953) (surrender of a lease does not extinguish liability that has already accrued). The Condominium Trust claims that Massport violated §§6.5 and 6.8 of the 1973 Lease during the term of that Lease. On this record it cannot be said that there was no breach.
Massport alternatively argues that the six-year statute of limitations for contracts bars the Condominium Trust’s claim under the 1973 Lease. G.L.c. 260, §2. However, when a contract is under seal, the statute of limitations is extended to twenty years. G.L.c. 200, §20. The 1973 Lease was signed under seal. Under the various assignments of rights, the Condominium Trust holds Leonard Silver’s rights under the 1973 Lease. Massport’s motion for summary judgment with regard to the Condominium Trust’s claims under the 1973 Lease is DENIED.
COUNT IV. Breach of Covenant of Good Faith and Fair Dealing
During oral argument, the Condominium Trust informed the Court that it does not maintain that Massport did not convey good marketable title to real estate. Further, the Condominium Trust represented that it has no evidence of breach of an implied covenant. Accordingly, Massport’s motion for summary judgment with respect to Count IV is ALLOWED.
COUNTV. G.L.c. 93A, §11: Unfair or Deceptive Acts or Practices
Massport argues that the Condominium Trust cannot maintain a G.L.c. 93A claim against Massport because (1) the claim is barred by the statute of limitations; (2) the parties never entered into a business relationship; and (3) Massport lacked knowledge of the environmental contamination during its ownership.
A chapter 93A claim is barred if brought more than four years after the accrual date. Massport argues that Charles Hill, a condominium owner and member of the Condominium Trust, knew or should have known of environmental contamination in 1975 in his capacity as an employee of Leonard Silver, and therefore, the accrual date occurred in 1985 with the delivery of the deed to the Property to Leonard Silver’s nominee. In 1975, the Department of Public Health complained to Massport about air pollution. There is a genuine issue of disputed fact as to whether the presence of black smoke coming from the heating system’s smoke stack was sufficient to put one on notice that the Property was contaminated. Before exercising its option, Leonard Silver obtained an environmental report that there was no evidence of any oil or hazardous material release on the Property.
Next, Massport argues that it never entered into a business relationship with the Condominium Trust, and, thus, Massport does not come within the ambit of a chapter 93A claim. Massport did, however, have a business relationship with Leonard Silver. The Condominium Trust is the assignee of Leonard Silver. As such, it may maintain a chapter 93A claim against Massport based upon Massport’s alleged “unfair and deceptive” sale of the Property to Leonard Silver.[11] Rayner v. Bay State National Bank, 384 Mass. 310, 314 (1981).
Finally, Massport contends that because there is no evidence that it was aware of the existence of environmental contamination in 1985, there is no basis to conclude that Massport violated chapter 93A. Massport was notified by the Department of Public Health that it was violating air pollution standards. Massport was aware that there were emissions of black smoke from the boiler stack on the Property. There is evidence that the Fuel Tank leaked, that Massport negligently pumped water from the Fuel Tank resulting in oil spilling onto the Property, and that it knew the Fuel Tank had cracks. Although the Condominium Trust may not ultimately be able to establish that Massport knew something material which Leonard Silver did not also know, that possibility should not now be foreclosed. Summary judgment is disfavored where a party’s state of mind constitutes an essential element of the cause of action. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Drawing all inferences in favor of the non-moving party, just as it cannot be determined on this record that Leonard Silver knew enough so that its claim is barred by the statute of limitations, so too it cannot be determined that Massport did not know enough so as to defeat any timely chapter 93A claim. Connecticut National Bank v. Kommit, 31 Mass.App.Ct. 348, 352-53 (1991) (although defendant would not have burden on issue of its knowledge at trial, incumbent upon moving party to show that proof of its knowledge was unlikely to be produced at trial). Who knew what when remains a disputed fact. Therefore, Massport’s motion for summary judgment with respect to the G.L.c. 93A claim is DENIED.
ORDER
For the foregoing reasons, it is hereby ORDERED that Defendant’s Motion for Partial Summary Judgment be ALLOWED as to Count I with respect to G.L.c. 21E, §5 claims, Count II in its entirety, Count III with respect to contract claims not based upon alleged breaches of the 1973 Lease during the term of that Lease, and Count IV in its entirety, and that the motion otherwise be DENIED.

 There is evidence that Massport used a pump to remove *10 water from the Fuel Tank, and left it running overnight on at least four occasions, thereby spilling oil onto the ground. The record does not demonstrate that Charles Hill was aware of these facts.

 Under Article IV of the 1977 Lease, Massport agreed to convey the Property to Leonard Silver or its nominee for one dollar at the end of the term if all the rent had been paid in full. Article IV also gave Leonard Silver an option to purchase the Properly at any time, provided it tender to Massport an amount equal to the then remaining balance of rent due for the fifteen-year term. In return, Massport agreed to deliver a quit claim deed conveying “good record and marketable title” to the Property to Leonard Silver.

 The Sale-Leaseback Agreement provided that “[Leonard Silver] agrees to sell and convey and [Addison Realty Trust] agrees to purchase for the price and on the terms and conditions hereinafter described the [Property] and all of the right, title, and interest of [Leonard Silver] in and to all appurtenances, leases, agreements, licenses, and personal property . . . relating thereto.”

 There is evidence that the TCE tanker trailer and drum were weathered, rusted, corroded and cracked, that strong odors of TCE were present around the drum, and that high levels of TCE were detected in the area around the trailer truck. There is also evidence that the Property had flooding problems. Accordingly, whether TCE in fact leaked or leached during the period of Massport’s ownership is a disputed question of fact precluding summary judgment on the grounds that no such passive activity took place.

 The Condominium Trust does not claim that Massport “caused" the TCE contamination within the meaning of G.L.c. §5 (a) (5).

 Webster’s New Collegiate Dictionary has been used as a tool in statutory construction. E.g., Scofield, v. Berman & Sons, Inc., 393 Mass. 95, 111 (1984); Commonwealth v. Maracic, 18 Mass.App.Ct. 722, 725 (1984).

 The statutes are not identical. There are significant differences which may have been the result of different political compromises. For example, G.L.c. 21E, unlike CERCLA, permits private parties to recover damages for injuries to their real and personal property, as well as to costs incurred in responding to contamination.

 Contra, Nurad, Inc. v. William E. Hooper & Sons. Co., 966 F.2d 837 (4th Cir. 1992) (prior owners liable for leaking from underground tanks on their property placed there before they became owners); Stanley Works v. Snydergeneral Corp., 781 F.Supp. 659 (E.D. Cal. 1990) (no reason to differentiate between prior and present owners); In re Hemingway Transport, Inc., 108 B.R. 378 (Bkrtcy. D.Mass 1989) (“disposal” encompasses leaking from overturned, obviously deteriorating drums from which tangible substance was emerging). Several of the cases construing CERCLA upon which the Condominium Trust relies do not, in fact, hold that mere ownership of property during a time in which subsurface pollutants leaked or leached is a sufficient basis upon which to predicate liability. For example, in Tanglewood East Homeowners v. Charles Thomas, Inc., 849 F.2d 1568 (5th Cir. 1988), a prior owner was found liable when hazardous materials were moved or dispersed during landfill excavations and fillings undertaken during its ownership. See also Emhart Industries, Inc. v. Duracell International Inc., 665 F.Supp. 549, 574 (N.D. Tenn. 1987) (defendant, as owner, actively introduced hazardous waste into property during manufacturing process and dumped waste outside plant where, in turn, it migrated through groundwater). Moreover, the holding in New York v. Shore Realty Corp., 759 F.2d 1032 (2d. Cir. 1985) is expressly limited to the liability of present owners for releases, not that of former owners for disposals.

 G.L.c. 21E, §5(c)(3) excepts from liability a person otherwise liable under §5(a) if it is established that the release or threat of release and damages resulting therefrom were caused by an “act or omission of a third party other than an employee or agent of the person ... if the person establishes . . . that he exercised due care . . . that he took precautions against foreseeable acts or omissions of any third party and the consequences that could foreseeably result from such acts or omissions, and that he complied with all notification requirements of section seven.”

 To the extent that Count II seeks damages under c. 21E, §5, it is time barred as well.

 Massport’s reliance upon John Boyd Co. v. Boston Gas Co., 775 F.Supp. 435, 440 (D.Mass. 1991), is misplaced. In that case, the court refused to extend c. 93A, §11 to subsequent, “merely foreseeable” purchasers of real estate. There was no suggestion that the plaintiff had been assigned rights pertaining to the property of a prior owner, who, in turn, had been in a business relationship with the defendant.