REDWING CARRIERS, INC., Plaintiff,

v.

SARALAND APARTMENTS, LTD.; Michael Coit and Christopher Weil, as legal representatives of the Estate of Robert Coit; Roar Company; Marcrum Management Company; Meador Contracting Company, Inc.; Hutton Advantaged Properties, Ltd.; and H/R Special Limited Partnership, Ltd., Defendants.

Civ. A. No. 91–0524–BH–S.

United States District Court,
S.D. Alabama,
Southern Division.

Jan. 10, 1995.

Sandy G. Robinson, Mobile, AL, J. Daniel Berry, Diane Gildersleeve, Beveridge & Diamond, P.C., Devarieste Curry, Washington, DC, for Redwing Carriers, Inc.

Thomas H. Benton, Jr., Mobile, AL, Wesley Pipes, Mobile, AL, Christopher M. Weil, Amy Brooks Ganci, Dallas, TX, for Saraland Apartments, Robert Coit, Roar Co.

Sandy G. Robinson, Mobile, AL, for Michael Coit, Christopher M. Weil.

Brock B. Gordon, Mobile, AL, for Marcrum Management Co.

Thomas E. Sharp, III, Mobile, AL, for Meador Contracting Co., Inc.

Victor T. Hudson, Mobile, AL, Andrew C. Rose, John L. Greenthal, Nixon, Hargrave, Devans & Doyle, Albany, NY, for Hutton Advantaged Properties Ltd., H/R Special Ltd. Partnership.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Senior District Judge.

This action is before the court on several summary-judgment motions.

Redwing Carriers, Inc., ("Redwing") brought this action primarily under 42 U.S.C. §§ 9607(a) and 9613(f), part of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Pursuant to 28 U.S.C. §§ 2201–02 and 42 U.S.C. § 9613(g)(2), this Florida corporation seeks to recover necessary costs it has incurred or will incur in responding to the release or threatened release of hazardous substances on real property in Saraland, Alabama, property which Redwing formerly owned and on which the Saraland Apartments now stand.

The defendants are:

● Saraland Apartments, Ltd., ("Saraland Limited") an Alabama limited partnership which owns the Saraland Apartments and the real property on which they are located ("the site"); Michael Coit and Christopher Weil, as legal representatives of the estate of Robert Coit, a general partner in Saraland Limited from 1984 until his death; and the Roar Company, a Texas corporation of which Robert Coit was president and the majority stockholder and which has been a general partner in Saraland Limited since 1984. These defendants are the "Saraland defendants";

● Hutton Advantaged Properties, Ltd., and H/R Special Limited Partnership, Ltd., both Massachusetts limited partnerships and both limited partners in Saraland Limited. These are the "Hutton defendants";

● Marcrum Management Company ("Marcrum"), an Alabama corporation which has been involved in the management of the Saraland Apartments since 1980; and

● Meador Contracting Company, Inc., ("Meador") an Alabama corporation which built the Saraland Apartments in the 1970s.[1]

## I. THE STATUTE

CERCLA authorizes suit against:

(1) the owner *and* operator of a vessel or a facility,

(2) any person who *at the time of disposal* of any hazardous substance owned *or* operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise *arranged for disposal* or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release[.]

42 U.S.C. § 9607(a) (emphasis added); *see United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1553–54 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990).

CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment[,]" 42 U.S.C. § 9601(22), with exceptions not relevant in this action. *See id.* A "disposal" is a

discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous substance into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

---

1. A.B. Meador, then president of Meador, was then a general partner in Saraland Limited but no longer is.

*Id.* § 9601(29) (adopting the definition found in *id.* § 6903(3)).[2]

Those responsible under the statute are liable for necessary costs which are consistent with a national contingency plan and which other persons have incurred, *id.* § 9607(a)(4)(B), and damages for injury to, destruction of, or loss of natural resources, including reasonable costs for assessing such injury, destruction, or loss. *Id.* § 9607(a)(4)(C).[3]

As the Eleventh Circuit has twice stated, "[t]he essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous waste on 'those responsible for problems caused by the disposal of chemical poison.'" *Fleet Factors,* 901 F.2d at 1553 (quoting *Florida Power,* 893 F.2d at 1317; *United States v. Aceto Agric. Chems. Corp.,* 872 F.2d 1373, 1377 (8th Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986)); *see also In re Bell Petroleum Servs., Inc.,* 3 F.3d 889, 897 (5th Cir.1993) (one purpose of CERCLA is to shift environmental clean-up costs to parties who benefited from the disposal of the wastes that caused the harm (citing *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 805–06 (S.D.Ohio 1983))).

> Defenses to § 9607(a) are in § 9607(b). There shall be no liability ... for a person ... who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions[.]

42 U.S.C. § 9607(b)(3).[4]

CERCLA further provides that

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under ... section 9607(a)[.] In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

*Id.* § 9613(f)(1).

## II. BACKGROUND

1. Redwing operated a trucking terminal on the Saraland, Alabama, site in question from 1961 to 1972. Redwing sold the site to Harrington, Inc., in 1971 which in turn sold the site to Apartments, Inc., later in 1971. In 1973, Apartments, Inc., sold the site to Saraland Limited,[5] which contracted with Meador to build the apartment complex. In 1984, Robert Coit and the Roar Company became general partners and the Hutton defendants became limited partners in Saraland Limited. Together, Coit's estate and the Roar Company have a 1 percent interest in Saraland Limited. The Hutton defendants together have a 99 percent interest in Saraland Limited, 98.99 percent for Hutton Advantaged Properties, Ltd., and 0.01 percent for H/R Special Limited Partnership, Ltd.

2. While Redwing operated a trucking terminal at the site, its trucks routinely carried

---

**2.** For definitions of "facility," "hazardous substance," and "vessel," see 42 U.S.C. §§ 9601(9), (14), and (28), respectively.

**3.** They are also liable for all costs of removal or remedial action incurred by the United States government, a state, or an Indian tribe consistent with the national contingency plan, *id.* § 9607(a)(4)(A), and the costs of any health assessment or health-effects study carried out under 42 U.S.C. § 9604(i). *Id.* § 9607(a)(4)(D).

**4.** Defenses under §§ 9607(b)(1) (an act of God) and (b)(2) (an act of war) are not at issue.

**5.** Some of the incorporators of Harrington, Inc., and Apartments, Inc., were involved in forming Saraland Limited.

such substances as asphalt, herbicides, and tall oil.[6] Unused asphalt was sometimes dumped into a pit on the site.[7] Hazardous[8] substances which Redwing disposed of and otherwise released at the site mixed with the asphalt,[9] creating a black tar-like substance[10] laden with hazardous substances. Some of the disposal and release occurred when Redwing washed its trucks[11] and routed waste into pits or ditches.[12] To contain hazardous substances washed from the trucks, Redwing built levees. In so doing, it used heavy equipment to move earth, thereby moving any hazardous substances near the levees and mixing them with surrounding soil.[13] Redwing also spread asphalt onto the ground six to eight inches deep, mixed in concrete and broken bricks,[14] graded the area, and spread cracked oyster shells from time to time.[15] The EPA alleges the release of hazardous substances at the site contaminated the groundwater.[16]

3. EPA aerial photographs taken when Redwing owned the site reveal "tank trailers, a bermed area, vertical tanks, standing liquids, ground stains, disturbed ground, channelized drainage and vegetation stress" but no drums, tanks, injection wells, visible leakage, or leachate.[17]

4. Redwing has found no evidence to indicate that when it sold the site, it informed the buyers of the presence of hazardous substances, despite having searched for such evidence now and again over the course of seven years,[18] but to some extent the presence of hazardous substances was public knowledge.[19] When a contractor who bid on construction work for the Saraland Apartments but did not receive a contract visited the site in 1971,[20] he saw some asphalt which was to be removed[21] but did not know that it was dangerous.[22]

5. In 1984, the Alabama Department of Environmental Management ("ADEM") responded to complaints from Saraland Apartments residents that the tar-like substance was seeping to the surface at the site.[23] The EPA was also notified.[24] ADEM found in 1985 that tar or asphalt, plus herbicides, chlorinated benzenes, and polynuclear aromatic hydrocarbons were below the surface

---

6. Am.Compl., 6–7.

7. Dep. of D. Fulkerson, Redwing's vice president for services, 155:6–8 (May 12, 1992); *see also id.* at 156:15–17.

8. The Environmental Protection Agency ("EPA") has identified them as hazardous. Redwing Resp. to Summ.J.Mot. by the Hutton Defs., Marcrum, and the Saraland Defs. ("Redwing Resp. I") (tab 154), 2.

9. Fulkerson Dep. at 334:10–15.

10. *E.g.,* Redwing Summ.J.Br. (tab 151), 12 n. 11.

11. EPA Site Analysis: Redwing Carriers, iii (August 1990) (Exh. 4 of Redwing Summ.J.Br.).

12. *Id.* at 1.

13. *See* Dep. of J. Piskura, 137:22–140:17 (Oct. 5, 1992). Piskura, senior vice president for services at the WCM Group, Inc., a Humble, Texas, environmental-consulting company, oversaw his company's performance of a "remedial investigation and feasibility study" at the site pursuant to the 1990 EPA "administrative order by consent." Aff. I of J. Piskura, 1–2 (Jan. 20, 1993) (Exh. 5 of Redwing Summ.J.Br.).

14. Statement of F. Sibley, Redwing's foreman at the site from 1964 to 1972, ¶ 4 (undated) (Exh. 13 of Meador Summ.J.Br.).

15. Piskura Dep. at 145:1–9.

16. Letter of P.M. Tobin, director, waste-management division, EPA Region IV, to R. Coit (Nov. 9, 1989) (Exh. C of tab 1), 1.

17. EPA Site Analysis at 1.

18. Fulkerson Dep. at 389:19–393:6

19. *See, e.g.,* B. Sullivan, *Saraland Truck Firm To Face Legal Action,* Mobile Press, July 16, 1970, at 1–G (reporting a lawsuit involving Redwing and the hazardous substances it washed from its trucks at the site, and noting that one dog had died and another burned the hair off its paws by walking through the site) (Exh. 6 of Redwing Summ.J.Br.).

20. Dep. of G. Knapp, 9:13 (May 21, 1992).

21. *Id.* at 12:9–16.

22. *Id.* at 41:2–7.

23. Am.Compl. at 9.

24. *Id.*

at the site.[25] Shortly thereafter Redwing entered into a 1985 "administrative order by consent" with the EPA, under which Redwing agreed to remove any contamination that appeared at the site.[26]

6. The EPA advised Redwing and the Saraland defendants in November 1989 that they may be liable under CERCLA to reimburse the government for money it spends cleaning up the site. *See id.* § 9607(a)(4)(A).[27] For purposes of summary judgment, the court accepts as true Redwing's claims that (1) it timely responded to and agreed to a proposed EPA 1990 "administrative order by consent" and "scope of work order," [28] (2) pursuant to the orders Redwing agreed to remove any material that seeped to the surface plus the source of the material,[29] (3) the Saraland defendants did not respond to the proposed orders, (4) Redwing, pursuant to the 1990 orders, conducted a "remedial investigation and feasibility study" to evaluate the site and identify means of dealing with the hazardous substances at the site,[30] and (5) Redwing has incurred CERCLA response costs exceeding $1.9 million.[31]

7. Redwing is looking for someone else, namely the defendants, "to pick up a portion of the tab[.]" [32]

### III. THE COMPLAINT AND THE COUNTERCLAIMS

8. In its amended complaint,[33] Redwing contends that:

- all defendants except Marcrum and Meador are liable as present owners or operators of the site, and Marcrum is liable as a present operator, *see Fleet Factors*, 901 F.2d at 1554 n. 3; *but see* 42 U.S.C. § 9607(a)(1);

- all defendants except Meador are liable as owners or operators of the site when disposal of hazardous substances occurred, *see* 42 U.S.C. § 9607(a)(2);

- all defendants are liable as persons who arranged for disposal of hazardous substances at the site, *see id.* § 9607(a)(3);

- all defendants are liable to Redwing for its response costs at the site, *see id.* § 9613(f);

- the Hutton defendants are liable to Redwing under Alabama partnership law for Saraland Limited's obligations to Redwing, *see* Ala.Code § 10–9A–42; and

- Redwing's incurring costs the defendant-owners of Saraland Limited should have borne has unjustly enriched them.

Redwing seeks a declaratory judgment that the defendants are jointly and severally liable for (1) the presence and the cost of removing hazardous substances at the site, and (2) the response costs Redwing has incurred and will incur. Redwing also seeks compensatory damages, equitable apportionment of response costs, and its costs and attorneys' fees.

The Saraland defendants have filed a counterclaim [34] seeking compensatory damages for harm to the site, diminution of its value, and their lost profits. They also seek punitive damages; indemnity or contribution for Redwing's claims, *see* 42 U.S.C. § 9613(f); their costs and attorneys' fees; and a declaratory judgment that Redwing is solely responsible under CERCLA.

The Hutton defendants have filed a counterclaim [35] seeking contribution from Redwing for any costs exceeding their equitable and proportionate share of liability. *See id.* If they are held jointly and severally liable,

---

**25.** *Id.*

**26.** *Id.* at 10.

**27.** *Id.;* Tobin Letter to Coit.

**28.** *See generally, In the Matter of Redwing Carriers, Inc., Saraland, Alabama, Site,* EPA Docket No. 90–53–C, Administrative Order by Consent for Remedial Investigation/Feasibility Study (July 1 and 3, 1985) (Exh. E of tab 1).

**29.** Am.Compl. at 10.

**30.** *Id.* at 11.

**31.** *Id.* at 12.

**32.** Fulkerson Dep. at 180:3–8.

**33.** Tab 29.

**34.** Tab 20.

**35.** Tab 61.

they seek indemnity or contribution from any party or responsible nonparty for any verdict or judgment exceeding their proportionate share of liability. With respect to their counterclaim, they also pray for compensatory and punitive damages with interest, plus their costs and attorneys' fees.

This action is before the court on motions for summary judgment by the Hutton defendants,[36] defendant Marcrum,[37] defendant Meador,[38] the Saraland defendants,[39] and plaintiff Redwing.[40] Marcrum and Meador move for summary judgment on Redwing's CERCLA claims. The Hutton defendants and the Saraland defendants move for summary judgment on Redwing's CERCLA claims and on their own CERCLA counterclaims, but not on Redwing's state-law claims or their state-law counterclaims. Redwing moves for summary judgment on its claims and on the defendants' counterclaims.

9. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–53, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

### A. Differences Between §§ 9607(a)(1) and (a)(2)

10. Under § 9607(a)(1), a person must be both current owner *and* current operator of a facility or vessel to be liable; under § 9607(a)(2), a person who either owned *or* operated a facility *at the time of disposal* can be liable. 42 U.S.C. §§ 9607(a)(1)–(a)(2); *see* C.E. Davidson, *Corporate Ownership of Real Estate: The Impact of Environmental Legislation on Shareholder Liability,* 17 Real Est.L.J. 291, 310–12 (1989); *contra Fleet Factors,* 901 F.2d at 1554 n. 3 ("Although the 'owner and operator' language of § 9607(a)(1) is in the conjunctive, we construe this language in the disjunctive in accordance with the legislative history of

CERCLA and the persuasive interpretations of other federal courts." (citing *United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573, 577–78 (D.Md.1986) (CERCLA was hastily drafted and is unclear); *Guidice v. BFG Electroplating & Mfg. Co.,* 732 F.Supp. 556, 561 (W.D.Pa.1989) (claiming without explanation in an apparent reference to § 9607(a)(1) that CERCLA imposes liability on "current owners or operators"); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1280 (D.Del.1987) (correctly quoting § 9607(a)(1) but holding that "and" means "or"); *Coastal Casting Serv. Inc. v. Aron,* 1988 WL 35012, *2, 1988 U.S.Dist. Lexis 18635, *7 (S.D.Tex.1988) ("CERCLA was hastily drafted and adopted, with resulting ambiguities"); 42 U.S.C. § 9601(20)(A) (defining "owner or operator" instead of "owner and operator"))).

Some courts have subtly transformed the phrase "the owner and operator," 42 U.S.C. § 9607(a)(1), into "the present owners and operators[.]" *See, e.g., Fleet Factors,* 901 F.2d at 1553 (citing *Florida Power,* 893 F.2d at 1317). This leads the reader to envision a group of owners and operators, some of whom may be only owners, some of whom may be only operators, and some of whom may be both, but all of whom are liable. The statutory text leads to a different conclusion.

One court has isolated the conjunctive phrase "the owner and operator," 42 U.S.C. § 9607(a)(1), held it is not clear, and construed "and" to mean "or." *See Maryland Bank,* 632 F.Supp. at 578 ("Proper usage dictates that the phrase 'the owner and operator' include only those persons who are both owners and operators. But by no means does Congress always follow the rules of grammar when enacting the laws of this nation.").

This court believes § 9607(a)(1) is clear. In any event, § 9607(a)(1) does not stand alone. It must be read in the context of § 9607(a)(2), which refers disjunctively to "any person who ... owned or operated any

**36.** Tabs 144, 205.

**37.** Tab 146.

**38.** Tab 191.

**39.** Tabs 148, 207.

**40.** Tab 150.

facility[.]" When the two are read together, there can be no doubt that § 9607(a)(1) refers to a legal person who is both owner and operator, while § 9607(a)(2) imposes liability regardless of whether a person was both owner and operator. There is nothing "unclear" or "ambiguous" about the word "and"; it is conjunctive.

Contrary to *Maryland Bank*, 632 F.Supp. at 578, it is entirely possible for a legal person to be both owner and operator of a facility. An owner could "carry[ ] out operational functions," *id.* (quoting 1980 U.S.Code Cong. & Ad. News 6119, 6182), for itself. It is incorrect to state that "a class defined as consisting of persons who are both owners and operators would contain no members." *Id.*

Moreover, the court respectfully submits that CERCLA's defining "owner or operator" does not persuasively support the *Fleet Factors* conclusion, because the phrase "owned or operated" is in § 9607(a)(2); the § 9601(20)(A) definition applies directly to § 9607(a)(2). The inability to perceive "a rational explanation, other than careless statutory drafting, for imposing liability upon 'owners *or* operators' under one section but only holding 'owners *and* operators' liable under another section[,]" *Fleet Factors*, 901 F.2d at 1554 n. 3 (emphasis in original), does not justify judicial rewriting of a statute. *See TranSouth Financial Corp. v. Johnson*, 931 F.2d 1505, 1507 (11th Cir.1991) (a court's analysis begins with the actual language and should be consistent with the plain meaning); *Seaboard Sys. R.R. v. Interstate Commerce Comm'n*, 827 F.2d 699, 701 (11th Cir.1987) (if a statute is clear on its face, the court need not examine additional sources for guidance), *cited with approval in Lee v. FlightSafety Services Corp.*, 20 F.3d 428, 433 (11th Cir. 1994) (courts should not read conjunctive phrases in regulations disjunctively) ("Such judicial rewriting of regulations is improper. A court should presume regulations mean what they say. If the executive branch wishes to reconsider them, it is free to do so. Judicial assistance is not required.").

■ A court should presume Congress means what it says when it drafts statutes, regardless of the speed at which it drafts them. Congress, not the courts, has the power to amend them. Judicial legislating upsets the constitutional balance of powers. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States"); *In re Diamond Reo Trucks, Inc.*, 115 B.R. 559, 566 (Bankr.W.D.Mich.1990) (CERCLA action) ("This court cannot be a legislative body; that function properly lies with Congress."); *Anspec Co. v. Johnson Controls, Inc.*, 734 F.Supp. 793, 796 (E.D.Mich.1989) (CERCLA action) ("Congress must be the body to make such changes. Only Congress has the resources to adequately investigate and determine whether or not liability under CERCLA should be imposed on additional parties. Until such time, the courts should not deviate from the four existing categories of potentially liable parties which Congress clearly mandated under CERCLA."), *rev'd on other grounds*, 922 F.2d 1240 (6th Cir.1991).

Although the doctrine of scrivener's error "permits a court to give an unusual (though not unheard-of) meaning to a word which, if given its normal meaning, would produce an absurd and arguably unconstitutional result[,] the *sine qua non* of any 'scrivener's error' doctrine . . . is that the meaning genuinely intended but inadequately expressed must be absolutely clear; otherwise we might be rewriting the statute rather than correcting a technical mistake." *United States v. X–Citement Video, Inc.*, — U.S. —, —, 115 S.Ct. 464, 474, 130 L.Ed.2d 372 (1994) (Scalia, J., dissenting) (citing *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring)); *see also Union Bank v. Wolas*, 502 U.S. 151, 162–63, 112 S.Ct. 527, 534, 116 L.Ed.2d 514 (1991) (Scalia, J., concurring). It is not absurd and unconstitutional for Congress to have meant "and" instead of "or" in § 9607(a)(1), so the doctrine of scrivener's error would not allow a court to rewrite § 9607(a)(1).

11. The court notes that reading § 9607(a)(1) as "the owner or operator" would not change the result of this order.

### B. The Hutton Defendants

#### 1. Ownership

■ 12. The Hutton defendants are limited partners in Saraland Limited, the limit-

ed partnership which owns the site. It is the limited partnership which owns the site, not the partners. Partners' interest in limited partnerships is personal property. Ala.Code § 10–9A–120. Their interest permits them to share the profits and losses of the limited partnerships; receive distributions of assets; and receive income, gain, loss, deduction, credit, or similar items. *Id.* § 10–9A–1(10). Limited partners do not, by virtue of being limited partners, own what the limited partnership owns. Therefore, the Hutton defendants cannot be liable under CERCLA as owners of the site. This eliminates any possibility of the Hutton defendants being liable as "the owner *and* operator," 42 U.S.C. § 9607(a)(1) (emphasis added), and eliminates one means by which they could be liable as "person[s] who at the time of disposal ... owned *or* operated any facility[.]" *Id.* § 9607(a)(2) (emphasis added).

■ 13. Whether the limited partners would be liable for any obligations of the limited partnership is a different issue, one which depends on limited-partnership law, not on CERCLA. A limited partner may be liable to a third party for the obligations of the limited partnership only if he participates in the control of the business. Ala.Code § 10–9A–42(a). "However, if his participation is not substantially the same as a general partner's exercise of powers, the limited partner is liable only to persons who, with actual knowledge of his participation in control and in reasonable reliance thereon, transact business with the partnership." *Id.*

In this action, Saraland Limited is not liable,[41] so there are no obligations of the limited partnership for which a limited partner can be liable under partnership law. Redwing's partnership-law claim is moot.

### 2. Operation

■ 14. CERCLA's definition of "operator" is circular, and therefore unhelpful, because it uses the word "operating." *See* 42 U.S.C. § 9601(20)(A)(ii); *Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 419 n. 1 (7th Cir.1994) (the definition is circular, so the terms have their ordinary meanings rather than unusual or technical meanings (citing

*Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 156 (7th Cir.1988))).

15. Redwing urges the court to rely on the *Fleet Factors* holding that courts should construe CERCLA liberally "to achieve the 'overwhelmingly remedial' goal of the CERCLA statutory scheme[. A]mbiguous statutory terms should be construed to favor liability for the costs incurred by the government in responding to the hazards at such facilities." *Fleet Factors,* 901 F.2d at 1557 (quoting *Florida Power,* 893 F.2d at 1317 (a liberal judicial interpretation of "arrange" is required under § 9607(a)(3) to achieve CERCLA's "overwhelmingly remedial" statutory scheme)). *Fleet Factors* and *Florida Power* do not support Redwing on this point. It is one thing for courts to construe statutes liberally if that is the intent of the framers, but it is quite another—and quite improper— for courts to do what Redwing in effect suggests: read into statutes what is not there and misconstrue terms. Moreover, other Eleventh Circuit CERCLA law defines operator.

Because CERCLA contemplates "operator" liability based only on a person's actions, merely owning stock in a corporation that disposed of hazardous waste is not sufficient, without more, to hold a shareholder liable as an operator of the corporation's facility. *United States v. Kayser-Roth Corp.,* 910 F.2d 24, 27 (1st Cir.1990) ("[I]t is obviously not the usual case that the parent of a wholly owned subsidiary is an operator of the subsidiary. To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary."), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991): "Rather, shareholders are operators for purposes of liability under CERCLA when 'they themselves actually participate in the wrongful conduct prohibited by the Act.'" *Riverside Mkt. Dev. Corp. [v. International Bldg. Prods., Inc.,* 931 F.2d 327, 330 (5th Cir.), *cert. denied,* 502 U.S.

41. *Infra* ¶ 54.

1004, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991)].

*Jacksonville Elec. Auth. v. Bernuth Corp.,* 996 F.2d 1107, 1110 (11th Cir.1993).

> The plain language of the statute leads to the conclusion that a person is liable as an "operator" when that person actually supervises the activities of the facility. That is, the person, must play an active role in the actual management of the enterprise. ... a parent corporation may be held liable as an operator of its subsidiary's business only when it "exercises actual and pervasive control of the subsidiary to the extent of actually involving itself in the daily operations of the subsidiary. Actual involvement in decisions regarding the disposal of hazardous substances is a sufficient, but not a necessary, condition to the imposition of operator liability."

*Id.* (quoting and affirming *Jacksonville Elec. Auth. v. Eppinger & Russell Co.,* 776 F.Supp. 1542 (M.D.Fla.1991)). The court will apply the rule of *Jacksonville Electric* to this action and reject Redwing's assertion that the limited partners' alleged *authority to* control the limited partnership makes them liable as operators. *See id.*

Redwing primarily cites *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 842 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), to support its assertion. *Nurad* suggested supposed advantages of a broader definition of "operator" and wrote the court's policy preferences into the statute. *See id.* The latter is not the task of a court. Whether the preferences are correct is immaterial. *See, e.g.,* The Federalist No. 78 (A. Hamilton). In any event, Redwing, citing *Nurad,* implies that since it has cooperated with the EPA,[42] the defendants should reimburse Redwing lest future liable entities like Redwing be disinclined to spend money cleaning up hazardous substances.[43] This is not persuasive, particularly coming from Redwing.[44]

■ 16. With respect to Redwing's contention that the Hutton defendants are liable as operators, Redwing first argues that they controlled Saraland Limited as evidenced by their alleged involvement in "decid[ing] which partners would be responsible for solving the tar problems at the [s]ite"[45] and considering whether to sue Redwing over the matter.[46] Second, Redwing argues that the Hutton defendants are "operators" because they (1) recommended rent increases and capital improvements at the Saraland Apartments, (2) recommended that Saraland Limited meet with Marcrum to discuss the management of the complex, (3) requested and received bids for the capital improvements, (4) recommended assisting an interim apartment-complex manager, (5) recommended cash-flow improvements for Saraland Limited after the 1986 tax-reform act phased out passive-loss deductions,[47] and (6) were expected to pay Saraland Limited's legal bills.[48] As evidence of the Hutton defendants actual control of Saraland Limited, Redwing also cites their 99 percent ownership of the limited partnership.

17. It is hubris for Redwing to assert in effect that the Hutton defendants' efforts at dealing with, and protecting themselves legally from, the mess Redwing created[49] make the Hutton defendants liable to Redwing. This court will not turn such absurdity into law.

18. Moreover, in *Jacksonville Electric,* the Eleventh Circuit held that an alleged operator of a corporation was not an operator under CERCLA even though (1) it owned all or almost all of the stock of the corporation it was alleged to have operated, (2) it dictated the terms of employment of the corporation's president, (3) it created a profit-sharing plan for corporate officers, (4) it distributed divi-

---

**42.** *See supra* ¶ 6.

**43.** Redwing Summ.J.Br. at 4.

**44.** *See supra* ¶¶ 1–5; *infra* ¶ 54.

**45.** Redwing Summ.J.Br. at 38.

**46.** *Id.* at 39.

**47.** *Id.* at 37–42.

**48.** Redwing Supplemental Resp. to Summ.J.Mot. by the Hutton Defs., Marcrum, and the Saraland Defs. (tab 164), 4.

**49.** *See, e.g., supra* ¶¶ 1–5; *infra* ¶ 54.

dends which exceeded net earnings, an action which was alleged to have contributed to the corporation's not maintaining its equipment properly, (5) it received reports at trustee meetings on the corporation's operations, (6) it hired a director, vice president, and general manager, (7) its trustees stated that it carried on a business at the facility, and (8) during its ownership, the corporation changed the chemicals it used. *Jacksonville Elec.*, 996 F.2d at 1110–11. Assuming *arguendo* the truth of Redwing's allegations of the Hutton defendants' actions in "controlling" Saraland Limited, no reasonable jury could conclude that the alleged "control" has exceeded the control which the alleged operator exercised in *Jacksonville Electric*, so the Hutton defendants are not liable under § 9607(a)(1), nor are they liable as operators of the Saraland Apartments under § 9607(a)(2).

■ 19. Even if the Hutton defendants were owners or operators under § 9607(a)(2), they have been involved with Saraland Limited only since 1984, when they became limited partners. The alleged disposals since then are the parking-lot repaving and the natural-gas line maintenance work, which were not disposals under CERCLA.[50] Therefore, no disposal occurred when the Hutton defendants are alleged to have owned or operated the site. This provides further support for the court's conclusion that the Hutton defendants are not liable under § 9607(a)(2).

### 3. Arrange for Disposal

20. Since there was no disposal when the Hutton defendants were involved with Saraland Limited, they could not have arranged for any disposal and are not liable under § 9607(a)(3).[51]

■ 21. Even if there were a disposal, there is no contention or sufficient evidence to persuade a reasonable jury that the Hutton defendants intended to dispose of hazard-

ous substances when the parking lot was repaved or the natural-gas line maintenance work was performed, nor is there any contention or sufficient evidence to persuade a reasonable jury that the Hutton defendants made the crucial decisions regarding how, where, and when the alleged disposal was to occur. These are further reasons why the Hutton defendants are not liable under § 9607(a)(3).[52]

### C. Marcrum

#### 1. Operation

■ 22. Redwing again demonstrates its hubris, this time by arguing in effect that *Marcrum's* efforts at dealing with the mess Redwing created make it liable to Redwing as an operator of the site.[53] Redwing also argues that Marcrum is an operator because Gary Marcrum, the president of Marcrum Management Company, managed Saraland Limited from 1974 to 1978 on behalf of another company. He formed Marcrum Management Company in 1978. When the company became involved in the management of Saraland Limited in 1980, Redwing claims Gary Marcrum used the knowledge he had gained while previously working at the site.[54] None of that makes Marcrum Management Company an operator. *Cf. Jacksonville Elec.*, 996 F.2d at 1110–11.

■ 23. In further attempting to show that Marcrum is an operator, Redwing asserts that "Marcrum is responsible for the day-to-day operation of the site,"[55] but that begs the question. Redwing then specifically asserts Marcrum is responsible for responding to physical conditions at the site; hiring, training, supervising, and terminating the resident manager; exercising actual and direct control of routine matters; attempting to maintain regulatory obligations to the tenants; negotiating access agreements which

---

50. *Infra* ¶ 29 (discussion of similar issues with respect to Marcrum).

51. *See infra* ¶ 27.

52. *See infra* ¶ 31.

53. *See* Redwing Summ.J.Br. at 48–51.

54. *Id.* at 46–47.

55. *Id.* at 47.

were in the tenants' best interests;[56] undertaking preventative maintenance; securing independent contractors for extraordinary repairs; receiving and responding to tenants' maintenance requests; and purchasing necessary maintenance equipment.[57] However, none of the exhibits which Redwing cites provide anything more credible than conclusory allegations that Marcrum is an operator. Conclusory allegations do not prevent summary judgment. *E.g., Jordan v. Southern Wood Piedmont Co.,* 805 F.Supp. 1575, 1578 (S.D.Ga.1992) (CERCLA action) (citations omitted). Moreover, no reasonable jury could conclude that what Redwing asserts Marcrum has done in "operating" the site has exceeded what the alleged operator in *Jacksonville Electric* did. Finally, Redwing has provided no case law to support persuasively the holding of an apartment-complex management corporation such as Marcrum liable as an operator under CERCLA.

24. Based on the foregoing, Marcrum is not liable under § 9607(a)(1) or (a)(2).

### 2. "Disposal" under CERCLA and "Arrange for Disposal" under § 9607(a)(3)

25. In interpreting CERCLA, a court must recognize that statutes have limits as well as ends. "A court's job is to find and enforce stopping points no less than to implement other legislative choices." *Edward Hines Lumber,* 861 F.2d at 157 (citing *Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1439 (7th Cir.1988)), *cited with approval in City of North Miami v. Berger,* 828 F.Supp. 401, 412 n. 19 (E.D.Va.1993); *United States v. Consolidated Rail Corp.,* 729 F.Supp. 1461, 1469 (D.Del.1990); *United States v. New Castle County,* 727 F.Supp. 854, 870 (D.Del. 1989); *Diamond Reo Trucks,* 115 B.R. at 565.

26. Redwing claims that Marcrum is liable under § 9607(a)(2) as an operator at the time a disposal occurred and under § 9607(a)(3) for arranging for disposal of hazardous substances. It supports both claims by noting Marcrum had the apartment-complex parking lot repaved and had natural-gas lines at the site repaired, and by asserting these actions dispersed hazardous substances.

27. Redwing cites *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988), to support its contention that the term "arrange for disposal" in § 9607(a)(3) applies to those who "arrange" the hazardous substances. *Tanglewood* does assert that "since disposal may be merely the 'placing of any ... hazardous waste into or on any land[,'] those who move the waste about the site *may* fall within the terms of the provision[,]" *id.* (emphasis added) (quoting 42 U.S.C. § 6903(3) (definition of "disposal" adopted in CERCLA, 42 U.S.C. § 9601(29))), but Redwing stretches § 9607(a)(3) beyond its limits. This section does not impose liability for arranging or rearranging hazardous substances. It imposes liability for *arranging for* disposal. Absent a disposal, there is no liability for any arranging. *Prudential Ins. Co. of Am. v. United States Gypsum,* 711 F.Supp. 1244, 1255 (D.N.J.1989) (without a disposal there is no § 9607(a)(3) claim); *see Florida Power,* 893 F.2d at 1318 (a manufacturer of a hazardous substance is liable under § 9607(a)(3) only if it arranges for disposal of it).

28. To define "disposal," CERCLA uses the words "discharge, deposit, injection, dumping, spilling, leaking, or placing[.]" 42 U.S.C. §§ 9601(29), 6903(3). A "release" is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." *Id.* § 9601(22). Since the word "disposing" is in the definition of "release," it is redundant that the concepts of discharge, injection, dumping, spilling, and leaking appear in both definitions, but this does not change the fact that "disposal" is a subset of "release." Some things which are releases—pumping, pouring, emitting, emptying, escaping, leaching—are not also disposals. *See id.; United States v. Petersen Sand & Gravel, Inc.,* 806 F.Supp. 1346, 1351 n. 2 (N.D.Ill.1992).

---

56. *Id.* at 47–51 (citing, *inter alia,* Exhs. 1 ¶ 4, 31 ¶ 5, 40 (Dep. of J.M. Fried, 119–25) (June 2, 1992), and 41 ¶ 15 of Redwing Summ.J.Br.).

57. Redwing Resp. I at 34; Exh. 124 of Redwing Summ.J.Br., ¶ 13.

Congress must have intended there be a difference between "disposal" and "release," otherwise it would not have used two different terms, much less defined them differently. The limit on the definition of "disposal" is significant because §§ 9607(a)(2) and (a)(3) use the term, and because, as the court has noted, "[t]he essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous waste on 'those responsible for problems caused by the *disposal* of chemical poison.'" *Fleet Factors,* 901 F.2d at 1553 (emphasis added) (quoting *Florida Power,* 893 F.2d at 1317; *Aceto,* 872 F.2d at 1377; *Dedham Water,* 805 F.2d at 1081).

Discussing the distinction in the context of § 9607(a)(2) operator liability, the Northern District of Illinois has held that

> Congress could have made operator liability depend on a "release"; instead, Congress designed the entire CERCLA response scheme to activate whenever a "release" occurred, but limited the liability for operators to those who were operators during a "disposal." Some distinction must have been intended, and the so-called innocent owner defense shows that the distinction must have been between active and passive events.

*Petersen Sand & Gravel,* 806 F.Supp. at 1351 (passive migration of hazardous substances is not a disposal). The Northern District of California has also recognized that the definition of "disposal" is limited:

> In ascertaining what disposal means, the Court looks at its definitional components and finds that these three nouns (discharge, deposit, and injection) and four gerunds (dumping, spilling, leaking, and placing), when read together, all have in common the idea that *someone do something with hazardous substances.* Taking the clearest example, the Court notes that "placing", read in the context of the statute, means a person introducing—putting—formerly controlled or contained hazardous substances into the environment. For plaintiff solipsistically to read, for example, "leaking" as meaning the general migration of chemicals and, as such, a disposal under § 9607(a)(2), renders not only

the definitional phrase of § 6903(3) "into or on any land or water" superfluous, but would also conflict with the general structure of § 9607(a).

*Ecodyne Corp. v. Shah,* 718 F.Supp. 1454, 1457 (N.D.Cal.1989) (emphasis added) (dismissing a CERCLA action because the defendants did not introduce hazardous substances onto the property and also because the plaintiff alone was responsible for the disposal (citing *Emhart Indus., Inc. v. Duracell Int'l, Inc.,* 665 F.Supp. 549 (M.D.Tenn. 1987)); *see also Diamond Reo Trucks,* 115 B.R. at 565 (following *Ecodyne* ) ("the mere ownership of the site during a period of time in which migration or leaching may have taken place, without any active disposal activities, does not bring [a party] within the liability provision of § 9607(a)(2)").

■ Another distinction between "disposal" and "release" is discernable from their statutory definitions. A disposal occurs only when hazardous substances *"may* enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. §§ 9601(29), 6903(3) (emphasis added); *see Petersen Sand & Gravel,* 806 F.Supp. at 1351 (focusing on this second half of the definition of "disposal"). Stirring up or rearranging hazardous substances which have already "enter[ed] the environment or be[en] emitted into the air or discharged into any waters, including ground waters" *within a single tract* of a facility or vessel, without moving or dispersing the same hazardous substances to another tract of the same facility or vessel, might or might not be a release, but it is not a disposal. *Cf. Petersen Sand & Gravel,* 806 F.Supp. at 1351; *Ecodyne,* 718 F.Supp. at 1457.

Nevertheless, Congress did not limit "disposal" to the first time someone introduced hazardous substances into a facility or vessel. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1342 (9th Cir.1992). It is conceivable, for example, that one person could dispose of hazardous substances in one tract of a facility or vessel; later, the same person or another person could move or disperse the same substances *to another tract* of the same facility or vessel. The latter's action might, but would not nec-

essarily, be a "second-hand" disposal if (1) tract is expansively defined, (2) the person sought to be held liable affirmatively undertook to introduce hazardous substances into the other tract, *cf. Ecodyne,* 718 F.Supp. at 1457, *Prudential,* 711 F.Supp. at 1254 (absent an affirmative act to get rid of asbestos beyond the selling of it as part of a product, there is no § 9607(a)(3) claim); *C. Greene Equip. Corp. v. Electron Corp.,* 697 F.Supp. 983, 987 (N.D.Ill.1988) (to be liable under § 9607(a)(3), a party must have affirmatively acted to dispose of waste by dumping it on a site (citing *Jersey City Redevelopment Auth. v. PPG Industries,* 655 F.Supp. 1257, 1260 (D.N.J.1987))); *Diamond Reo Trucks,* 115 B.R. at 565; *Catellus Dev. Corp. v. United States,* 34 F.3d 748, 750 (9th Cir.1994) (" 'disposal' refers 'only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance' " (quoting *3550 Stevens Creek Assocs. v. Barclays Bank,* 915 F.2d 1355, 1362 (9th Cir.1990))); *AM International, Inc. v. International Forging Equip. Corp.,* 982 F.2d 989, 998 (6th Cir.1993) (disposal requires an affirmative act; conveying a useful substance for a useful purpose is not a disposal (citing *Prudential,* 711 F.Supp. at 1253)), and (3) the hazardous substances "may enter the environment or be emitted into the air or discharged into any waters, including ground waters[,]" 42 U.S.C. §§ 9601(29), 6903(3); *see AM International,* 982 F.2d at 998; *Petersen Sand & Gravel,* 806 F.Supp. at 1351, in the other tract.

One could imagine using the second half of the definition of "disposal"—"so that such solid waste or hazardous waste or any constituent thereof *may* enter the environment or be emitted into the air or discharged into any waters, including ground waters[,]" 42

U.S.C. §§ 9601(29), 6903(3) (emphasis added)—to hold that once hazardous substances *have entered* the environment or been emitted into any waters anywhere in the facility or vessel, *any* moving or dispersing of those particular hazardous substances *anywhere within the facility or vessel* is not a disposal under CERCLA. However, such a narrow definition of "second-hand disposal" would allow a party who otherwise would be liable to do almost anything with the hazardous substances within the confines of the facility or vessel once the hazardous substances have entered the environment or been emitted into any waters there. The court rejects this as inconsistent with the intent of the framers of CERCLA. *Cf. id.*

For the same reason, the court declines to follow *Kaiser Aluminum,* 976 F.2d at 1342 (excavating tainted soil, moving it away from the excavation area, and spreading it over uncontaminated portions of the site is a disposal under § 9607(a)(2) (citing *Tanglewood,* 849 F.2d at 1573)) [58] or extend *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,* 989 F.2d 1305, 1314 (2d Cir.1993) (a disposal may occur involuntarily, referring to the introduction of hazardous substances into a facility or vessel per §§ 9601(29) and 6903(3), *i.e.,* a first-hand disposal), by holding that an alleged second-hand disposal can occur involuntarily. CERCLA provides no indication that it so significantly restrains economic development at previously contaminated sites.

Instead, the court adopts a compromise between these two extremes and holds that to be a disposal under CERCLA, an alleged second-hand disposal must itself be voluntary; *i.e.,* it must result from an affirmative act to introduce hazardous substances into another tract, expansively defined, of the

---

**58.** One must be careful not to misread the Fifth Circuit's assertion that there may be "disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings." *Tanglewood,* 849 F.2d at 1573. This means only that it is possible for a disposal to occur at the same time hazardous substances are moved, dispersed, or released. Contrary to Redwing's assertion, this quote from *Tanglewood* does not mean that moving, dispersing, or releasing hazardous substances constitutes a disposal *per se. See Massachusetts v. Blackstone Valley*

*Elec. Co.,* 777 F.Supp. 1036, 1040 (D.Mass.1991) (citing *Tanglewood* but dismissing a claim).

Moving or dispersing hazardous materials already at a facility or in a vessel might or might not be a release, but it is less likely to be a disposal.

Furthermore, saying that a release is automatically a disposal would be backwards, because "disposal" falls within the definition of "release." Under CERCLA, all disposals are releases, but not all releases are disposals.

facility or vessel. If an alleged second-hand disposal is involuntary, it is not a disposal under CERCLA, even if the act which caused it was voluntary. This constraint on the definition of "second-hand disposal" does not apply to "first-hand" disposals.

Any broader definition of "disposal" poses the danger of collapsing "disposal" into "release," *see, e.g., HRW Systems, Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 339 (D.Md.1993) (a disposal occurs when hazardous substances are released regardless of whether there is any volitional participation), or frustrating the essential purpose of CERCLA articulated by the Eleventh Circuit in *Fleet Factors* and *Florida Power.*

29. In that light, neither the repaving of the parking lot nor the maintenance work on the natural-gas lines was a "disposal" of hazardous substances. The repaving of the parking lot was just that: repaving. Those who pave parking lots do not *ipso facto* dispose of hazardous substances. Moreover, natural-gas line maintenance work requires digging, performing work, and filling up the hole or trench with the same dirt removed when the hole or trench was dug.[59] That is not a disposal, because it occurred within one tract of the site. Even if hazardous substances were moved or dispersed to another tract, there is no evidence sufficient to persuade a reasonable jury that Marcrum affirmatively undertook to introduce hazardous substances into another tract. Only Redwing's conclusory allegations suggest that anything illegal occurred, but, again, conclusory allegations will not prevent summary judgment.[60]

30. Based on the foregoing, the court concludes that if Marcrum was an operator, there was no disposal when Marcrum was an operator, so it cannot be liable under § 9607(a)(2). Since there was no disposal, there was nothing to arrange which would impose liability, so Marcrum is not liable under § 9607(a)(3).

31. The conclusion that Marcrum is not liable under § 9607(a)(3) is further supported by focusing on the words "arranged for," which imply intentional action. *Amcast Indus. Corp. v. Detrex Corp.,* 2 F.3d 746, 751 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994); *Florida Power,* 893 F.2d at 1319 (affirming a district court's granting of summary judgment under § 9607(a)(3) because the plaintiff presented no affidavits demonstrating the defendants intended to dispose of hazardous substances); *United States v. Cello–Foil Prods., Inc.,* 848 F.Supp. 1352, 1357 (W.D.Mich.1994) (§ 9607(a)(3) applies only when a party intended to dispose of a hazardous substance (citing *Amcast,* 2 F.3d at 751)); *see Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651, 654 (N.D.Ill.) (§ 9607(a)(3) liability attaches only when a party transacts in a hazardous substance in order to dispose of or treat it), *aff'd,* 861 F.2d 155 (7th Cir.1988). Moreover, unless a party sought to be held liable is a manufacturer of a hazardous substance, *see Florida Power,* 893 F.2d at 1318, § 9607(a)(3) imposes liability only if the party made "the crucial decisions as to how, where and when to dispose of a hazardous substance." *G.J. Leasing Co. v. Union Elec. Co.,* 854 F.Supp. 539, 559 (S.D.Ill.1994) (citing *Amcast,* 2 F.3d at 751; *United States v. A & F Materials Co.,* 582 F.Supp. 842, 845 (S.D.Ill.1984)).

Since Redwing does not contend, nor could it persuade a reasonable jury based on the evidence presented, that Marcrum intended to dispose of hazardous substances by having the parking-lot repaved and having work performed on the natural-gas lines, Marcrum is not liable under § 9607(a)(3).

---

**59.** Piskura Aff. I at ¶ 8.

**60.** The court notes some facts which are not dispositive. By the estimate of Redwing's own expert, 1,600 cubic yards of tar-like material are buried at the site at depths of six inches to six feet. Piskura Dep. at 57:15–59:18. The predominant amount is one to three feet below the surface. *Id.* at 59:19–60:6. Redwing claims a total of 5,500 cubic yards of dirt and associated material must be removed because dirt mixed with the tar-like material. *Id.* at 70:17–72:22. The parking-lot repaving and the natural-gas line maintenance work required moving less than one cubic yard of dirt and associated material. *Id.* at 84:8–13. Even Redwing's expert witness admits the effect of such work was small. *Id.* at 88:7–89:12.

## D. Meador

32. Redwing's claim against Meador is filed only under § 9607(a)(3). When Meador contracted to build the Saraland Apartments, it agreed to "remove oil and pitch and other contaminates [*sic*] and soils contaminated by previous waste disposal from [the] site."[61] First, Redwing alleges Meador did not comply with this specification; instead, the construction activities of Meador and its subcontractor spread out the hazardous substances, mixed them with the surrounding dirt, increased the volume of material which must be removed by three to five fold,[62] and contaminated a part of the site which was an undisturbed woods when Redwing owned it.[63] Redwing claims all of this[64] was a disposal. Second, Redwing alleges Meador applied the pesticides chlordane and dieldrin to the soil during construction "for purposes of 'soil poisoning.' "[65] While "soil poisoning" may sound evil, it is actually an old term for the application of pesticides.

### 1. Construction

33. Redwing's criticism of Meador and others for not removing all the tar—even what did not surface—during construction[66] is misdirected. That may or may not have violated the construction-contract specifica-

tions, but it does not impose CERCLA liability. *Cf.* 42 U.S.C. § 9607(a).

34. The entire site includes 15 acres,[67] but Redwing alleges the tar-like material is spread over about 2.5 acres.[68] Given Redwing's activities on the site,[69] no reasonable jury could conclude that Redwing itself did not spread tar-like material laden with hazardous substances over a substantial part of the 2.5 acres, so, in this instance, the entire 2.5 acres constitutes one tract of the facility. Therefore, what Redwing alleges occurred during construction is not a disposal under CERCLA, and the construction activities impose no § 9607(a)(3) liability upon Meador.[70]

### 2. Pesticides

35. Redwing's own expert witness has testified that the only chemicals on the site not deposited there by Redwing were pesticides used to treat termites.[71] Meador had a subcontractor spray the foundation for termites when it built the apartments,[72] and Redwing alleges Meador used chlordane and dieldrin.

36. CERCLA provides that

No person (including the United States or any State or Indian tribe) may recover under [§ 9607] for any response costs or

---

**61.** Addendum No. 1 to Specifications for Saraland Apartments, Item 3(B) (March 13, 1973) (Exh. 23 of Redwing Summ.J.Br).

**62.** *E.g.*, Redwing Summ.J.Br. at 11–12, 52–53; Piskura Dep. at 57:15–58:9, 70:17–72:22.

**63.** Aff. II of J. Piskura, ¶ 4 (Feb. 25, 1993) (Exh. 121 of Redwing Summ.J.Br.).

**64.** Although it is not dispositive, the court will note that Meador denies this occurred. Meador's construction field-superintendent for the Saraland Apartments construction project has testified that "oily goo," "a black tar, a black substance," surfaced during construction. Dep. of F. Aubrey, 12:12–13:3, 18:12–14 (Oct. 1, 1992). Using a backhoe, a bulldozer, and a front-end loader, *id.* at 18:9–19:6, the contractor, digging to a depth of one foot, *id.* at 13:4–8, removed all the "goo" it could find and hauled it plus all of the excavated dirt away from the site. *Id.* at 37:1–38:6. He claims that none of the contaminated soil was used as fill. *Id.* at 62:1–6. Removing all of the "goo" the contractor could find proved difficult because it was buried deep, but the contractor accomplished the task without

pushing around or otherwise rearranging the surrounding dirt. *Id.* at 37:20–38:17.

Even Redwing's own expert and a Redwing officer concede the contractor's removal of "goo" *reduced* the amount of hazardous substance now at the site. Piskura Dep. at 163:6–11; Fulkerson Dep. at 397:5–15.

**65.** Redwing Summ.J.Br. at 53.

**66.** *E.g.*, Redwing Resp. to Meador Summ.J.Mot. (tab 195), 5.

**67.** EPA Site Analysis at 1.

**68.** *See* Piskura Dep. at 59:4–9.

**69.** *Supra* ¶¶ 1–5.

**70.** *See supra* ¶¶ 27–28.

**71.** Piskura Dep. at 14:7–11.

**72.** Meador Resp. to Redwing Summ.J.Mot. (tab 166), 1.

damages resulting from the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act [("FIFRA") 7 U.S.C. § 136 *et seq.*]. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance.

*Id.* § 9607(i). This is significant because chlordane was approved by the EPA and registered under FIFRA when Redwing alleges it was applied.[73] Dieldrin was approved and registered for "ground insertions for termite control." [74]

37. "Section 9607(i) exempts the 'application' of a covered pesticide from CERCLA liability, but retains liability for a 'release' of such a pesticide." *In re Sundance Corp.*, 149 B.R. 641, 663 (Bankr.E.D.Wash.1993); *see also Jordan*, 805 F.Supp. at 1581. Although neither CERCLA nor FIFRA defines "application," *Sundance*, 149 B.R. at 663, not everything done with a pesticide is an application. *See id; South Florida Water Management Dist. v. Montalvo*, 1988 WL 242688, *2, 1988 U.S.Dist. Lexis ——, —— (S.D.Fla. 1988) (spilling a pesticide is not an application). Whatever "application" means, Redwing has alleged only that Meador applied chlordane and dieldrin, so there is no § 9607(a)(3) liability for using them. Even if Redwing alleged Meador released either pesticide, there is no sufficient evidence to persuade a reasonable jury of that.

38. Nevertheless, Redwing would have this court hold that Meador is liable for using a pesticide because the EPA cancelled the reg-

istration of it after the alleged use. In effect, Redwing would have the court apply FIFRA pesticide-registration cancellations retroactively. The Supreme Court has recently used sweeping language to voice skepticism about retroactivity of statutes. *See Landgraf v. USI Film Prods.*, —— U.S. ——, ——–——, 114 S.Ct. 1483, 1497–99, 128 L.Ed.2d 229 (1994) (the Civil Rights Act of 1991 may not be applied retroactively). Applying retroactivity to Meador's situation would improperly impair rights it had before it acted, increase its liability for past conduct, or impose new duties with respect to transactions already completed unless there is "clear congressional intent" that the statute is retroactive. *See id.* at ——, 114 S.Ct. at 1505; *see also id.* at ——, 114 S.Ct. at 1522 (Scalia, J., concurring) (only the statutory text can provide clear congressional intent; legislative history cannot) (citations omitted). Since there is no such clear intent in FIFRA, *see, e.g.*, 7 U.S.C. §§ 136a(a), 136a(d)(2), 136*l*, the court declines to apply registration cancellation retroactively.

39. In the alternative, a reasonable jury could not conclude that by using chlordane and dieldrin Meador intended to dispose of hazardous substances, so Meador is not liable under § 9607(a)(3) for having "arranged for disposal" of hazardous substances by using either pesticide.[75]

## E. The Saraland Defendants

40. Citing § 9607(a), all of the Saraland defendants concede that the site is a facility, a release has occurred, and Redwing has incurred response costs.[76] The next questions are whether the Saraland defendants are responsible parties under § 9607(a) and whether the defenses of § 9607(b) apply.

---

**73.** Piskura Dep. at 15:8–13. Redwing concedes that a review of the Federal Register and of documents which Meador submitted at the court's request indicate that chlordane, although no longer registered under FIFRA, was registered when Redwing alleges it was used to spray for termites during construction of the Saraland Apartments. Redwing Resp. to Court Order (tab 186), 1.

**74.** 37 Fed.Reg. 12904, 12906 (June 29, 1972) (exh. A of Redwing Resp. to Meador Summ.

J.Mot.). Although additional uses of dieldrin were suspended later, 39 Fed.Reg. 37246, —— (Oct. 18, 1974), this occurred *after* Meador's last application of dieldrin at the construction site, on January 9, 1974. Aff. of A.B. Meador, 1 (Aug. 23, 1994).

**75.** *See supra* ¶ 31.

**76.** Saraland Defs. Summ.J.Br. (tab 149), 9.

41. The parties have pointed out that the federal government has subsidized the Saraland Apartments; however, that does not affect CERCLA liability. *Cf.* 42 U.S.C. § 9607(a).

### 1. Ownership/Operation by the General Partners

42. Robert Coit and the Roar Company became general partners in Saraland Limited, the limited partnership which owns the site, in 1984. As has been stated,[77] it is the limited partnership which owns the site, not the partners. The general partners are like the limited-partner Hutton defendants in that they do not, by virtue of being general partners, own what the limited partnership owns. Therefore, they cannot be liable under CERCLA as owners of the site.

No reasonable jury could conclude, based on the evidence presented, that whatever the general partners did in operating the site[78] exceeded what the alleged operator in *Jacksonville Electric* did, so they are not liable as operators either.[79]

This eliminates any possibility that the general partners could themselves be liable under §§ 9607(a)(1) or (a)(2).

43. However, whether they as general partners would be liable for any obligations of the limited partnership is a different issue, one which depends on partnership law, not on CERCLA. *See* Ala.Code § 10–8–52.

### 2. "Disposal" under CERCLA and "Arrange for Disposal" under § 9607(a)(3)

44. Even if the general partners were owners or operators under § 9607(a)(2), the only alleged disposals since they became general partners are the parking-lot repaving and the natural-gas line maintenance work, which were not disposals under CERCLA.[80] The fact that no disposal occurred when the general partners are alleged to have been owners or operators provides further support for the court's conclusion that the general partners are not liable under § 9607(a)(2). Furthermore, absent a disposal, there was nothing to arrange which would impose liability, so the general partners are not liable under § 9607(a)(3) either.[81]

Similar reasoning applies to Saraland Limited with respect to the parking-lot repaving and the natural-gas line maintenance work. Neither activity imposes liability on Saraland Limited under § 9607(a)(2) or (a)(3).

45. The other alleged disposal involves the construction of the Saraland Apartments in the 1970s. The construction imposes no § 9607(a)(2) liability on the general partners, because they did not own or operate the site at the time of the alleged disposal. The construction imposes no § 9607(a)(2) liability on any of the Saraland defendants, including the limited partnership itself, because no disposal occurred during construction.[82] There is no § 9607(a)(3) liability for the Saraland defendants for construction activities, because there was no disposal during construction,[83] and also because there is no evidence which could persuade a reasonable jury that the Saraland defendants intended to dispose of hazardous substances during construction and took part in the crucial decisions regarding how, where, and when to dispose of hazardous substances.[84]

### 3. Ownership/Operation by Saraland Limited

46. Saraland Limited states that as the current owner of the site it is potentially liable, even though it contends it is not an

---

77. *Supra* ¶ 12.

78. *E.g.,* Saraland Defs.Summ.J.Br. at 22–23; *see* Redwing Summ.J.Br. at 31–33. In fact, based on the evidence presented, no reasonable jury could conclude that the general partners did anything in operating the site.

79. *See supra* ¶ 18.

80. *Supra* ¶ 29.

81. *See supra* ¶ 27.

82. *See supra* ¶¶ 34–39.

83. *Supra* ¶¶ 27, 29.

84. *See supra* ¶ 31.

operator. *But see* 42 U.S.C. § 9607(a)(1).[85] For purposes of summary judgment, it declines to assert the defenses of § 9607(b). The court will assume Saraland Limited is "the owner and operator" under § 9607(a)(1). Although the court can grant summary judgment for Saraland Limited under §§ 9607(a)(2) and (a)(3), it cannot do so under § 9607(a)(1). That does not prevent granting summary judgment under § 9613(f)(1) and thereby absolving Saraland Limited of any CERCLA liability.

#### 4. Defenses

 47. Even if Michael Coit and Christopher Weil, as legal representatives of the estate of Robert Coit, and the Roar Company were liable under § 9607(a), the defenses of § 9607(b) would protect them. Based on the evidence presented, a reasonable jury could conclude only that the parties have established by a preponderance of the evidence that "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party other than an employee or agent of the [general partners], or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the[m.]" *Id.* § 9607(b)(3). Although the standard of due care and the requirement of taking precautions against the third party's—Redwing's—foreseeable acts or omissions, and the foreseeable consequences thereof, *id.*, did not necessarily require any defendants to contact the EPA or the ADEM, the general partners exercised due care with respect to the hazardous substances, and took such precautions, by contacting the EPA and the ADEM when the tar began surfacing[86] and by not significantly worsening the problem.[87] Due care could not require more than these defendants did in such circumstances. Contrary to Redwing's assertion,[88] exercising due care did not require the defendants to (1) prevent the tar from surfacing (how were

they supposed to do *that?*), (2) enter into an "administrative order by consent" with the EPA, (3) submit a counterproposal to such an order, or (4) refrain from litigation to block EPA access to the site.

#### F. The CERCLA Counterclaims

48. The Hutton defendants and the Saraland defendants have filed CERCLA counterclaims. They assert that even if they are liable under § 9607(a), they are not jointly and severally liable, because the harm is "divisible" and the damages can be "apportioned." Furthermore, they claim Redwing should bear all the response costs, because, as the Saraland defendants have stated, it is "responsible for problems caused by the disposal of chemical poison." *Fleet Factors,* 901 F.2d at 1553 (quoting *Florida Power,* 893 F.2d at 1317; *Aceto,* 872 F.2d at 1377; *Dedham Water,* 805 F.2d at 1081).

49. Redwing has moved for summary judgment on the counterclaims, asserting the Saraland defendants and Hutton defendants cannot recover under CERCLA because they have not incurred response costs under CERCLA. *See* 42 U.S.C. § 9607(a)(4). However, § 9613(f)(1) allows "[a]ny person [to] seek contribution from any person who is liable or potentially liable under section 9607(a) ... *during or* following any civil action under ... section 9607(a)" (emphasis added). Moreover, "the choice as to when to address divisibility and apportionment are questions best left to the sound discretion of the trial court in the handling of an individual case." *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 723 (2d Cir.1993), *quoted and cited with approval in Bell Petroleum,* 3 F.3d at 899, 901 (an early resolution of the divisibility inquiry is preferable). "[T]he logical consequence of delaying the apportionment determination may well be drastic, for it seems clear that a defendant could easily be strong-armed into settling where other defendants have settled in order to avoid being held liable for the remainder of the

---

**85.** Saraland Limited appears to have accepted the *Fleet Factors* understanding of § 9607(a)(1). *See supra* ¶ 10.

**86.** Saraland Defs.Summ.J.Br. at 26–27.

**87.** No reasonable jury could conclude from the evidence presented that the general partners did anything to worsen the problem.

**88.** Redwing Resp. I at 30.

response costs." *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 270 n. 29 (3d Cir.1992), *quoted and cited with approval in Bell Petroleum*, 3 F.3d at 898–99. For this reason and for reasons of judicial economy, the court will consider the defendants' CERCLA counterclaims, and the arguments on divisibility of harm and apportionment of damages, at this juncture.

50. Under CERCLA the relative degree of fault is relevant to an action for contribution under § 9613(f). *United States v. Monsanto Co.*, 858 F.2d 160, 168 n. 13 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Damages are apportioned if the defendant can demonstrate that the harm is divisible, *O'Neil v. Picillo*, 883 F.2d 176, 178 (1st Cir. 1989) (citing *Chem–Dyne*, 572 F.Supp. at 809–11; *Monsanto*, 858 F.2d at 171–73; *United States v. Bliss*, 667 F.Supp. 1298, 1312–13 (E.D.Mo.1987)), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), an issue which Congress left for the judiciary to resolve on a case-by-case basis. *Environmental Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir.1992); *O'Neil*, 883 F.2d at 179 (citing *Monsanto*, 858 F.2d at 171 n. 23). CERCLA "can be terribly unfair in certain instances in which parties may be required to pay huge amounts for damages to which their acts did not contribute. Congress recognized such possibilities and left it to the courts to fashion some rules that will, in appropriate instances, ameliorate this harshness. Accordingly, Congress has suggested, and we agree, that common-law principles of tort liability set forth in the Restatement provide sound guidance." *Bell Petroleum*, 3 F.3d at 897.

51. The court adopts the following rule of *Monsanto:*

[W]hen two or more persons act independently to cause a single harm for which there is a reasonable basis of apportionment according to the contribution of each, each is held liable only for the portion of harm that he causes. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n. 8, 99 S.Ct. 2753, 2756 n. 8, 61 L.Ed.2d 521 (1979). When such persons cause a single and indivisible harm, however-

er, they are held liable jointly and severally for the entire harm. *Id.* (citing Restatement (Second) of Torts § 433A (1965)). We think these principles, as reflected in the Restatement (Second) of Torts, represent the correct and uniform federal rules applicable to CERCLA cases.

Section 433A of the Restatement provides:

(1) Damages for harm are to be apportioned among two or more causes where

 (a) there are distinct harms, or

 (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

*Monsanto*, 858 F.2d at 171–72 (quoting Restatement (Second) of Torts § 433A), *cited with approval in O'Neil*, 883 F.2d at 179; *see also Bell Petroleum*, 3 F.3d at 895.

52. The first question is whether the harm is divisible, *i.e.*, whether there are distinct harms or whether there is a reasonable basis for determining the contribution of each cause to the harm. If the harm is divisible, the next question involves apportioning the damages, *i.e.*, response costs, "among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

Whether the harm is divisible—whether the response costs can be apportioned—is a question of law, but the actual apportionment is a question of fact. *Bell Petroleum*, 3 F.3d at 896 (citing Restatement (Second) of Torts §§ 434(1)(b), 434(2)(b), comment d). Appropriate equitable factors are items to consider in *actually apportioning* the response costs but not in deciding whether the response costs *can be apportioned. Alcan Aluminum*, 964 F.2d at 270 n. 29; *Monsanto*, 858 F.2d at 171 n. 22.

"[A] court may consider any factors appropriate to balance the equities in the totality of the circumstances." *Environmental Transp. Sys.*, 969 F.2d at 509 (citing *United States v. R.W. Meyer, Inc.*, 932 F.2d 568 (6th Cir.1991)). "[I]n any given case, a court may consider several factors, a few factors, or only one determining factor ... depending

on the totality of circumstances presented to the court." *Id.*[89] Although the issue of contribution may not always lend itself to summary judgment, the party opposing summary judgment must present "evidence raising a genuine issue of material fact as to either the fault issue or some other equitable factor that [the] district court could consider in order to decide how to allocate costs." *Id.* at 510 (citing *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11).

 53. Based on the facts set forth, the court concludes as a matter of law that the harm at the site is divisible. Depending on how one looks at the facts, either there are "distinct harms," or "there is a reasonable basis for determining the contribution of each cause to a single harm." Whichever view one takes, the harm is still divisible.

54. The appropriate equitable factors to consider in allocating response costs in this action are the identity of the party responsible for the disposal and the party's other actions with respect to the site. After extensive review of the documents submitted, the court finds that a reasonable jury could conclude only that, among the parties before the court, the disposal of hazardous substances at the site results entirely from Redwing's actions, and that among these parties, justice requires Redwing bear all, and the defendants bear none, of the response costs. If indeed "[t]he essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous waste on 'those responsible for problems caused by the disposal of chemical poison[,]'" *Fleet Factors,* 901 F.2d at 1553 (quoting *Florida Power,* 893 F.2d at 1317; *Aceto,* 872 F.2d at 1377; *Dedham Water,* 805 F.2d at 1081), then Redwing should not be able to dispose of hazardous substances by itself and, in the words of one of its officers, look for someone else "to pick up a portion of the tab[.]"[90]

*See Ecodyne,* 718 F.Supp. at 1457–58 (dismissing a CERCLA action because the defendants did not introduce hazardous substances onto the property and also because the plaintiff alone was responsible for the disposal).

55. Summary judgment is due to be granted for the Hutton defendants and the Saraland defendants on their CERCLA counterclaims. It is also due to be granted in favor of all the defendants on Redwing's § 9613(f) claim.

56. The court is aware that an EPA order in this matter varies significantly from this order of this court.[91] The EPA's order is not binding on this court.

### G. The Unjust–Enrichment Claim

 57. In light of the foregoing, Redwing's claim for unjust enrichment filed against the defendant-owners of Saraland Limited is moot. Nevertheless, the court will note that the

> right of recovery for unjust enrichment is equitable, its basis being that in a given situation it is contrary to equity and good conscience for [a] defendant to retain a benefit which has come to him at the expense of [a] plaintiff.

> To find unjust enrichment, a party must have received something of value, to which he was not entitled and which he must restore, under circumstances making the enrichment unjust and compensable.

42 C.J.S. *Implied Contracts* § 5 (1991) (citing *Allstate Ins. Co. v. Reeves,* 440 So.2d 1086 (Ala.Civ.App.1983)). Unjust enrichment may be grounds for restitution, but the enrichment must be unjust. *See Allstate,* 440 So.2d at 1089 (citing 66 Am.Jur.2d *Restitution and Implied Contracts* §§ 5, 23; 5 A.L.R. 4th 311, § 8(a) 343; Restatement of the Law, *Restitution* § 117; *Hartford Fire Ins. Co. v.*

---

89. The *A & F Materials* court chose six equitable factors which were part of an amendment to a House of Representatives CERCLA bill which did *not* pass. *Environmental Transp. Sys.,* 969 F.2d at 508 (quoting *A & F Materials,* 578 F.Supp. at 1256). Such factors may or may not be appropriate in some circumstances, but their being part of a bill which did *not* become law grants them no virtue.

90. Fulkerson Dep. at 180:3–8.

91. *See In the Matter of Redwing Carriers, Inc., (Saraland) Superfund Site,* U.S. EPA Docket No. 93–24–C, Unilateral Administrative Order for Remedial Design and Remedial Action (July 16, 1993) (directed to all parties in this action and others) (tab 172).

*Albertson,* 59 Misc.2d 207, 298 N.Y.S.2d 321 (1969)).

■ 58. Having paid CERCLA response costs for the release of hazardous substances on property it once owned, Redwing asks the court to find that Redwing's paying the clean-up bill for its disposal of hazardous substances has somehow unjustly enriched the current owners of the property. Even assuming that Redwing has enriched whoever owns the site, the enrichment is not unjust.

### H. The State–Law Counterclaims

59. In their counterclaim, the Hutton defendants assert:

● based on the doctrine of active-passive negligence, they are entitled to indemnity from Redwing for all their response costs, remedial costs, clean-up costs, expenses, and attorneys' fees;

● Redwing's contamination of the site constituted a trespass accompanied by fraud, malice, aggravation, and gross negligence, because Redwing knew that it was washing hazardous substances onto the ground when it washed its trucks at the site; and

● Redwing, by willfully and wantonly not disclosing its contamination of the site to its predecessors[92] in interest and to regulatory agencies, proximately caused financial harm to the Hutton defendants. The Hutton defendants claim Saraland Limited has lost money, Saraland Limited has incurred expenses, their interest in Saraland Limited has lost value, they have been exposed to EPA liability which they have spent money responding to, and they have incurred attorneys' fees.

60. In their counterclaim, the Saraland defendants assert:

● the seeping to the surface at the site of the tar-like substance has interfered with their possession, use, and enjoyment of the site;

● Redwing has created and maintained a nuisance which endangers the defendants;

● Redwing negligently created the nuisance, negligently released hazardous substances, and did so with conscious disregard of the rights of others, including the defendants; and

● Redwing, while and after it owned, occupied, and used the site, failed to inspect periodically, warn, give notice, and abate the nuisance and make safe the defendants' property, the site, and the apartment complex.[93]

■ 61. In moving for summary judgment on these counterclaims, Redwing makes several arguments, one of which is based on caveat emptor. In ruling on state-law claims, the court must follow state law. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (quoting *Baltimore & O.R. Co. v. Baugh,* 149 U.S. 368, 401, 13 S.Ct. 914, 927, 37 L.Ed. 772 (1893) (Field, J., dissenting)).

■ 62. Alabama has some exceptions to caveat emptor as it applies to purchases of real property. Caveat emptor does not apply to the sale of a new home by a builder-vendor. *Cochran v. Keeton,* 287 Ala. 439, 440, 252 So.2d 313, 314 (Ala.1971). It does apply to the sale of used residential real estate, *Fennell Realty Co. v. Martin,* 529 So.2d 1003, 1005 (Ala.1988) (citing *Ray v. Montgomery,* 399 So.2d 230 (Ala.1980)), unless (1) "the purchaser of a used house inquires directly (either of the seller or of the seller's agent), prior to closing, about a material defect or condition of the home," *Fennell Realty,* 529 So.2d at 1005, or (2) "the agent (whether of the buyer or of the seller) has knowledge of a material defect or condition that affects health or safety and the defect is not known to or readily observable by the buyer[.]" *Id.* (citing *Cashion v. Ahmadi,* 345 So.2d 268, 270 (Ala.1977)); *see also Williamson v. Realty Champion,* 551 So.2d 1000, 1002 (Ala.1989). In the latter case, the agent and the seller must disclose the defect; they

---

**92.** The Hutton defendants apparently meant "successors."

**93.** This and the Hutton defendants' third state-law counterclaim are what the parties in their summary-judgment briefs call "fraudulent concealment."

are liable for damages which nondisclosure causes. *Fennell Realty*, 529 So.2d at 1005.

 63. Caveat emptor always applies to the sale of land with no dwelling. *DeAravjo v. Walker*, 589 So.2d 1292, 1293–94 (Ala.1991); *Morris v. Strickling*, 579 So.2d 609, 610 (Ala.1991). No implied warranty extends to the physical condition of purchased land. *Scott v. Gill*, 352 So.2d 1143, 1145 (Ala.Civ.App.1977) (citing *Cochran*, 287 Ala. 439, 252 So.2d 313; 77 Am.Jur.2d *Vendor and Purchaser* § 329), *quoted in Morris*, 579 So.2d at 610.

64. In this action, there was no dwelling on the site and the counterclaims are about the physical condition of the land, so caveat emptor applies. The health-and-safety exception to caveat emptor does not apply, Redwing's having disposed of hazardous substances notwithstanding. Redwing's summary-judgment motion on the state-law counterclaims is due to be granted. The counterclaimants' remedy in this matter is the enforcement of CERCLA, with Redwing paying all the response costs.

65. The court need not consider the other aspects of Redwing's summary-judgment motion, which relate particularly to the nuisance counterclaim, the trespass counterclaim, the fraudulent-concealment counterclaim, and the statutes of limitations on the counterclaims.

SO ORDERED.

### JUDGMENT

With regard to CERCLA, there is no genuine issue of material fact, and all the defendants are entitled to judgment as a matter of law. The court GRANTS summary judgment for the defendants. It is therefore ORDERED, ADJUDGED, and DECREED that judgment be entered in favor of the defendants and against the plaintiff. Redwing's unjust-enrichment and partnership-law claims are MOOT. Redwing's summary-judgment motion is DENIED as it relates to CERCLA, unjust enrichment, and partnership law.

With regard to the state-law counterclaims of the Hutton defendants and the Saraland

defendants, there is no genuine issue of material fact, and the plaintiff-counterdefendant is entitled to judgment as a matter of law. The court GRANTS the plaintiff's motion for summary judgment as it relates to these counterclaims. It is therefore ORDERED, ADJUDGED, and DECREED that judgment be entered in favor of the plaintiff and against the Hutton defendants and the Saraland defendants on the state-law counterclaims.

Redwing's motion for costs and attorneys' fees is DENIED, but the Hutton defendants' and the Saraland defendants' motions for costs and attorneys' fees remain.

SO ORDERED.